In re Jeffrey Alan MANNING, Judge of the Court of Common Pleas, Fifth Judicial District, Allegheny County.

No. 1 JD 97.

Court of Judicial Discipline
of Pennsylvania.

April 9, 1998.

Before McCLOSKEY, CASSEBAUM, MAGARO, MESSA, SYLVESTER, WEINBERG, and SWEENEY, JJ.

MAGARO, Judge.

## I. INTRODUCTORY SUMMARY

The Judicial Conduct Board (Board) filed a Complaint with this Court against Judge Jeffrey A. Manning (Respondent). The Complaint consists of eight Counts which are based on the allegations of two African-American women, Carolyn Greene and Ursula Riggins, that the Respondent referred to Ms. Greene as a "nigger" on December 18, 1993 (paragraphs 4–15 of the Complaint and Counts 1–4) and referred to Ms. Riggins as a "nigger" on December 20, 1995 (paragraphs 17–26 of the Complaint and Counts 5–8). We find that the Board did not sustain its burden of establishing by clear and convincing evidence the allegations made by either complainant.

## II. FINDINGS OF FACT

### 1. INTRODUCTORY

1. Respondent is a judge of the Court of Common Pleas for the Fifth Judicial District of Pennsylvania which encompasses Allegheny County.

2. Respondent has served as judge of that Court from June 10, 1988 to the present.

3. The Board filed a Complaint against respondent with the Court on March 20, 1997.

4. The Board divided the Complaint into two parts:

Part A (paragraphs 4–15) contains the allegations of Carolyn Greene regarding events alleged to have occurred on December 18, 1993. Counts 1–4 are based on these allegations.

Part B (paragraphs 17–26) contains the allegations of Ursula Riggins regarding events alleged to have occurred on December 20, 1995. Counts 5–8 are based on these allegations.

## 2. *PART A*

5. William H. Difenderfer is a lawyer who has practiced law in Allegheny County since 1983.

6. Carolyn Greene commenced employment as a legal secretary with the law firm of Laughlin and Difenderfer in 1989. During 1993 Ms. Greene was working directly for Mr. Difenderfer.

7. On Saturday, December 18, 1993, Difenderfer hosted a party at his home in Pittsburgh. Over the course of the evening some one hundred and fifty guests were in attendance. Among the guests were Carolyn Greene and respondent. Carolyn Greene is African–American; respondent is white.[1]

8. Carolyn Greene was accompanied by an unidentified friend. Respondent was accompanied by Rebecca McHolmes. Greene arrived around 9 p.m. and left around 11 p.m. Respondent arrived around 9 p.m. and departed around 12:30 a.m.

9. At the trial Ms. Greene testified that:

— When she arrived, respondent was playing a guitar in the living room.

— Sometime around 10:30 p.m. she was socializing with a group of people in the kitchen when the music stopped playing in the kitchen.

— The stereo system was capable of playing two CDs simultaneously, and at the time, the music in the kitchen was "like pop, rock and roll, jazz and mixture" and the music in the living room was "country-western."

— She was asked to change the CD.

— Robert Quinn, Difenderfer's brother-in-law, went with her to the sunroom where the CD player and stereo system were located.

— She placed a new CD in the player, closed the drawer and pressed the button to start play whereupon the country-western music in the living room was replaced by different music.

— Respondent, who had been in the living room, came up behind her in the doorway of the sunroom while she and Mr. Quinn were bent over the stereo trying to figure out what they did wrong and she heard him say "Why did you let that nigger change that music?"

— She did not see him say those words.

10. Respondent was not playing a guitar when Ms. Greene arrived or at any other time that evening.

11. The stereo system was capable of playing only one CD at a time which would be heard over all speakers.

12. At the time of the alleged incident, Ms. Greene was intoxicated and Mr. Quinn was extremely intoxicated.

13. At the time of the alleged incident, Donna Jo McDaniel, Rebecca McHolmes, and Anthony Mariani were close enough to hear what respondent said to Ms. Greene or Mr. Quinn.

14. McDaniel was six to eight feet from respondent when he spoke to Quinn. McHolmes was "close enough to touch him," and Mariani was "within a foot or so." None of the three heard respondent use the word "nigger."

15. Carolyn Greene did not file her Complaint with the Board until twenty-nine months later, in May, 1996, after she had called on the "hotline" established by WPXI–TV, Pittsburgh, which importuned the public to furnish the station with information tending to show that respondent was a racist.

16. Respondent did not use the word "nigger" on the evening of December 18, 1993 at Mr. Difenderfer's Christmas party.

---

1. We make this finding because it happens to be a fact in this case. Our making this finding is not to be construed to indicate that, in a case of this nature, we regard a finding of racial diversity to be critical, important, or even relevant to a finding that the use of a racial slur constitutes a violation of some constitutional or canonical tenet of judicial ethics. The Board apparently does consider it to be critical for it included the allegation in its Complaint as well as in its Proposed Findings of Fact. If the Board is correct, questions of equal protection would be implicated. In view of the disposition we make of this case, none of these questions need be addressed.

### 3. *PART B*

17. On the afternoon of December 20, 1995, respondent and his fiancée, Kathleen Murphy, accompanied respondent's sixteen year old son, Richard, to the Pittsburgh International Airport. Richard was travelling to some destination for the Christmas holidays on a flight scheduled to depart at 5:05 p.m. that day.

18. Respondent, his son and fiancée, arrived at a security checkpoint at approximately 4:30 p.m.

19. Ogden Aviation Co. provided the security at the airport and its employees were manning the checkpoint. Ursula Riggins was stationed at the x-ray machine and Bridget Eiselt and Michael Melnikof, Ogden supervisors, were stationed at a "podium" which was located approximately 25 feet from Riggins. A total of eighteen Ogden employees were working at the checkpoint at the time.

20. December 20 was the busiest day of 1995 at the airport and it was crowded and noisy at the checkpoint.

21. Respondent failed to clear the magnetometer which required that he be hand-scanned. He handed a garment bag to Riggins requesting that she hold it while he was being hand-scanned. Riggins is African-American; respondent is white.[2]

22. Riggins took the bag from respondent but was reluctant to do so as it interfered with her job which was to closely observe the x-ray monitor.

23. After some short period of time Riggins decided she should not hold the bag any longer and placed it at the end of the conveyor belt. This required her to leave her position and to turn off the belt.

24. Shortly thereafter respondent retrieved the garment bag and approached Riggins complaining that the bag had been torn as a result of her failure to hold it as requested.

25. An altercation ensued between Riggins and respondent during which:

— Respondent continued to blame Riggins for the damage to the bag and asked her to give him her name;

— Riggins told respondent to talk to her supervisor to make a claim with the airline;

— Respondent went to the podium and was given a claim form by Bridget Eiselt;

— Riggins and Respondent's fiancée then engaged in a heated verbal exchange which further agitated Riggins;

— At this point either Eiselt or Melnikof "took [Riggins] off the floor" and instructed her to go into a small room adjacent to the checkpoint, which she did.

26. The altercation lasted five to ten minutes.

27. Although there is an "emergency phone" at the checkpoint which provided immediate access to the police "alarm room," this phone was not used by any of the Ogden personnel on this occasion.

28. At no time during the altercation did any of the Ogden personnel know that respondent was a judge. Sometime shortly after Riggins left the floor, someone told Eiselt that respondent was a judge and Eiselt so advised Riggins.

29. Sergeant Donald Fox of the Allegheny County police was summoned to the checkpoint by Murphy and arrived at the vicinity of the podium some time during the altercation. When he arrived, Riggins was shouting obscenities at respondent.

30. When Fox arrived he immediately radioed for assistance and Patrolmen Harrison and Mohr responded and came to the checkpoint within a few minutes.

31. When Harrison arrived Fox was talking with Eiselt. When Mohr arrived one of the Ogden security persons told him there had been an argument over a bag, and Fox was talking with Harrison.

32. Fox instructed Harrison to prepare a report. About that time, Kathleen Murphy

2. See footnote 1, *supra*.

and Richard Manning returned to the podium to retrieve a backpack and Harrison interviewed Murphy concerning the incident. Harrison then interviewed Bridget Eiselt regarding the incident.

33. Riggins remained in the adjacent room for a short period and then went to the Ogden "break room" one floor above. Shortly thereafter Bridget Eiselt came into the break room with Officers Harrison and Mohr. At that time Riggins was highly agitated and expressing anger at Murphy for calling her a "nigger" or mouthing the word.

34. Harrison then conducted an interview of Riggins in the presence of Eiselt and Mohr.

35. Harrison prepared a report which he delivered to Fox that day. The report (R–4) contains the substance of his interviews of Murphy, Eiselt and Riggins which include no allegation that respondent used the word "nigger" at any time, but both Riggins's and Eiselt's include the allegations that Murphy "gave her the finger" and said the word "nigger."

36. About twenty minutes later, in accordance with Ogden protocol, Riggins wrote a report describing the incident. This report (R–2) includes no allegation that respondent used the word "nigger" at any time, and does include allegations that Murphy gave her "the finger" and "called [her] a nigger."

37. At the trial Riggins testified that, after discovering the bag was torn, respondent asked her who was running the x-ray machine, and, being advised that she was the operator, respondent said "Yeah, a fucking nigger." Riggins also testified that later respondent said "See, give a fucking nigger a job and see what happens."

38. Riggins testified that she wrote a second report in which she included the allegation that respondent had called her a "nigger." It was not established how much time elapsed after the first report until the second report was written. The Board did not produce this second report at the trial or attempt to establish what happened to it.

39. Eiselt was on vacation from December 22, 1995 to January 1, 1996. On January 1, she wrote out a report of the incident and

handed it in at the Ogden office. The same day a typewritten copy was made by a secretary in the office. The Board did not produce these reports at the trial or attempt to establish what happened to them.

40. At the trial the other Ogden personnel who appeared for the Board testified that they heard:

(a) respondent call Riggins a "fucking nigger" (Melnikof and Aiello),

(b) respondent say: "That's what happens when you give a fucking nigger a job" (Melnikof, Matich and Grove, though Grove did not hear the word "fucking"), and

(c) respondent say: "When a nigger has a job they think they rule the world" (Boley).

41. This testimony was not substantiated by the reports made out by these witnesses shortly after the incident and is, almost entirely, contradicted by these reports.

42. Shortly after the incident Riggins went to WPXI–TV with the story that respondent had used the word "nigger" during the episode at the airport on December 20, 1995.

43. Thereafter, Riggins met with WPXI–TV personnel a number of times. WPXI–TV employees contacted and interviewed Riggins's co-workers and conducted a "mass interview" at the Holiday Inn in Moon Township in preparation for a television show which was aired on WPXI–TV some time later.

44. At or about the time WPXI–TV's report of the incident at the airport was broadcast, WPXI–TV established a telephone "hotline" and requested members of the public to call with information tending to show that respondent was racially biased. This prompted Carolyn Greene to call on the "hotline" with her report of the incident at the Christmas party two years earlier. There is no evidence that any other calls were received.

45. There is no evidence, from any source, nor does the Board contend, that respondent's execution of his judicial responsibilities is in any way inflicted with racial

bigotry. The evidence affirmatively establishes the contrary.

46. Respondent's reputation for fairness and racial impartiality in the discharge of his judicial duties is excellent.

47. Statistics compiled by the Pennsylvania Commission on Sentencing demonstrate that the sentences imposed by respondent on non-whites have been more lenient that those he imposed on whites—by a substantial margin. In addition, the statistics establish that respondent's sentencing of non-whites is more lenient than that of the other judges throughout the Commonwealth—by a substantial margin.

48. Respondent did not use the word "nigger" on the afternoon of December 20, 1995 at the Pittsburgh International Airport.

### III. DISCUSSION

The constitutional amendment of 1993 establishing this Court provided certain specific instructions for the conduct of proceedings before this Court:

> All hearings conducted by the court shall be public proceedings conducted pursuant to the rules adopted by the court and in accordance with the principles of due process and the law of evidence. Parties appearing before the court shall have a right to discovery pursuant to the rules adopted by the court and shall have the right to subpoena witnesses and to compel the production of documents, books, accounts and other records as relevant. The subject of the charges shall be presumed innocent in any proceeding before the court, and the board shall have the burden of proving the charges by clear and convincing evidence.

Pa. Const. Article 5, § 18(b)(5).

The Pennsylvania Supreme Court has defined clear and convincing evidence as follows:

> The witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the pre-

cise facts in issue ... It is not necessary that the evidence be uncontradicted provided it "carries a clear conviction to the mind" or "carries a clear conviction of its truth."

*In re Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883, 886 (1986). See, also, *LaRocca's Trust*, 411 Pa. 633, 640, 192 A.2d 409, 413 (1963).

Acting pursuant to C.J.D.R.P. No. 501, the President Judge appointed a Panel to conduct the trial of this case. The Panel, consisting of Conference Judge Magaro, Judge McCloskey, Judge Cassebaum, Judge Messa and Judge Weinberg conducted the trial on October 29 and 30, 1997. Findings of Fact were initially made by the Panel.

█ Since the Constitution requires that "all actions of the court ... shall require approval by a majority vote of the members of the court" the Panel's Findings of Fact have been reviewed and this Decision is rendered by the full Court. Mindful of the reality, long jurisprudentially recognized, that assessments of credibility are best made by one who hears the witnesses testify and observes their demeanor, the Court is obliged to accord special deference to the Panel's Findings of Fact. The Supreme Court of Pennsylvania has addressed the subject as follows:

> As long as sufficient evidence exists in the record which is adequate to support the finding found by the trial court, as factfinder, we are precluded from overturning that finding and must affirm, thereby paying the proper deference due to the factfinder who heard the witnesses testify and was in the sole position to observe the demeanor of the witnesses and assess their credibility. This rule of law is well established in our jurisprudence and is rooted in concepts of fairness, common sense and judicial economy. (citations omitted)

*Commonwealth Dept. of Transportation v. O'Connell*, 521 Pa. 242, 248, 555 A.2d 873, 875 (1989). See, also, the observations of the United States Supreme Court in *Patton v. Yount*, 467 U.S. 1025, 1038, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), "the determination is essentially one of credibility, and therefore largely one of demeanor. As we have said on

numerous occasions, the trial court's resolution of such questions is entitled ... to 'special deference' ", and in *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 500, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), "The requirement that special deference be given to a trial judge's credibility determinations is itself a recognition of the broader proposition that the presumption of correctness that attaches to factual findings is stronger in some cases than in others." We also determine that this is a case where the presumption should be stronger rather than weaker because, in this case, credibility determinations were pivotal.

### 1. *PART A*

 We conclude that the evidence offered by the Board in support of the charges relating to the Complaint of Carolyn Greene that respondent referred to her as a "nigger" at the Christmas party in Difenderfer's home on December 18, 1993 does not meet the clear and convincing standard which the Board is obligated to attain. In fact, we find the evidence produced by the Board and the respondent to be so clear and convincing as to establish the opposite conclusion, i.e., that respondent did not refer to Ms. Greene as a "nigger" or use that word on the evening of December 18, 1993.

In determining whether respondent made the offensive remark to Mr. Quinn that evening—or not—our most important consideration is the testimony of those who heard what respondent said to Quinn on that occasion. Six individuals were in a position to hear what he said: one (Carolyn Greene) was presented by the Board, four (including respondent) were presented by the respondent. One (Robert Quinn) did not testify.[3]

We find Greene's testimony to be unconvincing for at least the following reasons:

1. She was intoxicated at the time. She herself admitted to having had three drinks and Difenderfer testified that he had been with her on prior occasions when she was drinking and when she was intoxicated and that he was able to discern whether she was sober or intoxicated. He testified that on that evening "she appeared to me to be also intoxicated" and "by both their mannerisms [Greene and Quinn], it was very evident to me that both of them had too much to drink."

2. Robert Quinn, the individual who was with Greene at the time and to whom the racial remark was supposedly addressed was "extremely intoxicated" and "belligerent." According to Difenderfer, who was Quinn's brother-in-law, he had a fistfight with Quinn that evening because "... my brother-in-law was extremely drunk and trying to pick fights with people at the party, including Judge Manning."

It is not disputed that respondent was annoyed that the country-western music which had been playing was abruptly changed and that he went to the sunroom to see what he could do about that and that an altercation with Quinn ensued. It does not follow, however, that respondent used the word "nigger" in the course of his exchange with Quinn, particularly in view of the latter's state of sobriety at the time.

3. Greene's testimony about other matters of that evening was mistaken. She was mistaken in her testimony that respondent was playing a guitar at the party. She was completely confused and mistaken about how the CD player and stereo system functioned and what occurred when she replaced the disc—which was what she was doing immediately before she testified the offensive remark was made.

4. She did not file her Complaint for more than two years after the occurrence, and then only after viewing a series of programs aired on WPXI–TV in 1996 which requested the public to call the station on a "hotline" with derogatory information about respondent.[4]

---

**3.** In his opening statement, counsel for the Board stated that Mr. Quinn was out of state and not subject to a subpoena. Of course, there is a well known and not particularly burdensome procedure to require the attendance of a witness at a deposition in whatever state the witness happens to be located.

**4.** See, e.g., *Commonwealth v. Lane,* 521 Pa. 390, 397–98, 555 A.2d 1246, 1250 (1989) where the Supreme Court said: "Unquestionably, a prompt complaint is a factor which must be assessed with all of the other evidence bearing upon the question of the credibility of the complaining witness.... The lack of a prompt complaint by

5. Greene's own testimony is that at the time she heard the word "nigger" she was not facing the speaker, but was bent over the stereo, and did not actually see respondent speak the words.

On the other hand, the testimony of the witnesses presented by the respondent establishes that he did not utter the word "nigger" that evening. These witnesses (other than respondent, who simply denied that he used the word "nigger") were Donna Jo McDaniel, Rebecca McHolmes and Anthony Mariani. It is our assessment that their testimony is clear and convincing for at least the following reasons:

1. Donna Jo McDaniel was "six to eight feet" from respondent when he spoke to Quinn. She "heard the conversation . . . and he did not use the word 'nigger' in that conversation at all." If he had used the word at that particular time she would have heard it and "absolutely would have" remembered it "because I would have been offended and I would have been surprised to hear him use that word."

2. Rebecca McHolmes was "beside [respondent] the whole time . . . close enough to touch him" when he spoke to Quinn. She "absolutely" would have heard respondent if he used the word "nigger" and "would absolutely recall whether he had said that word." She testified "she didn't recall what words he expressed, I just remember an argument about the music, but if he had said the word . . . I would have been very angry with him. I think it's the most vile word in the English language. If he would have used it, I would have remembered it, and I would have spoken to him about it." She was "absolutely certain" that he did not use the word.

3. Anthony Mariani was "within a foot or so" of Quinn and respondent and heard "every word" of the conversation. He is "absolutely certain" that respondent did not use the word "nigger" in that conversation.

There is no evidence in this record to suggest that at the time these events occurred these three witnesses, as well as the respondent, were anything other than sober.

We find the testimony of these witnesses establishes that respondent did not use the word "nigger" in speaking with Quinn about changing the music that night.

## 2. PART B

■ The Board presented seven witnesses who testified that respondent used the words "nigger" or "fucking nigger" in the course of his encounter at the airport on December 20, 1995. We find this testimony impossible to believe for a number of reasons.

First and foremost is the startling fact that ten reports were made by these seven witnesses, all shortly after the incident took place,[5] and not one contains an allegation that respondent used the words "nigger" or "fucking nigger."

We find it particularly incredible that Riggins would fail to include allegations that respondent had used those words in the report handwritten by her twenty minutes after the incident if, in fact, he had. Conversely, we find their omission from her report to be a strong indication that he did not use them. This conclusion is strengthened by a consideration of what Riggins *did* include in her handwritten report. Riggins wrote, in describing the argument over the garment bag:

> . . . he came back to me and said I told you to hold my bag in a very nasty way. I told him that wasn't my job. I tried to be nice. They went back to the desk to talk to the CSS. I looked back to tell Bridget and Mike what happened and his wife and his son kept giving me the finger (middle) and called me a "nigger" several times.

We regard this statement as an accurate report of what occurred. We believe:

—that if respondent had called Riggins a "nigger," Riggins would have so stated in her report—just as she reported that the "wife" had used that word,

a victim of a crime, although not dispositive of the merits of the case, may justifiably produce a doubt as to whether the offense indeed occurred . . ."

5. One by each witness, plus Riggins's second report and the statements given to Officer Harrison by Riggins and Eiselt immediately after the incident.

—that if respondent had called Riggins a "nigger" when he spoke to her "in a very nasty way," she would not have responded by telling him "that was not my job" nor would she have "tried to be nice,"—she would have exploded as she did at the wife.

Moreover, Riggins's description of the incident—particularly who said what—written by her twenty minutes after the event is in conspicuous conformity with:

1. Eiselt's description of the incident given to Harrison at the checkpoint immediately after the incident.

2. Riggins's description of the incident given to Harrison in the break room five minutes after the incident.

3. Officer Mohr's testimony, who was present at the Eiselt and Riggins interviews:

—that Eiselt never told Harrison that respondent used the word "nigger"

—that "the thrust of the conversation ... seemed to be directed toward the woman"

—that when he and Harrison arrived at the break room to interview Riggins she was "highly agitated," of "an angry demeanor" and stated that she "should have kicked the bitch's ass" and that Riggins's anger "was definitely directed at the woman."

4. Officer Harrison's testimony relating to the interviews of Eiselt and Riggins, notably:

—that Eiselt never said respondent used the word "nigger"

—that Eiselt was "very adamant about the fact that it was the woman who did it"

—that when he and Mohr arrived at the break room "[Riggins] was talking about killing the motherfucking bitch."

5. Sergeant Fox's testimony:

—that he was summoned to the checkpoint by "the woman who I thought was [respondent's] wife"

—that when he arrived at the podium Riggins was shouting obscenities at the respondent

—that he was at the podium with Bridget Eiselt and respondent and was close enough to hear what was being said

—that respondent did not say "fucking nigger" or "nigger" or "that's what happens when you give a nigger a job."

We therefore find that, if anyone used the word "nigger" that afternoon, it was respondent's companion, Murphy (the "wife"), and it was this which provoked Riggins, caused her to become highly agitated, and required her removal from the floor. This is what Eiselt told Harrison immediately after the incident. This is what Riggins herself told Harrison five minutes after the incident, and this is what Riggins herself wrote in her report twenty minutes after the incident.

Referring again to the reports made by the seven witnesses who testified at the trial that respondent had used the words "nigger" or "fucking nigger" in one context or another:

—Four contain no allegation that respondent made any racial remark (Riggins, Aiello, Riggins's statement to Harrison, Eiselt's statement to Harrison).

—Five contain allegations that "the wife" used the word "nigger" (Riggins, Melnikof, Grove, Riggins's statement to Harrison, Eiselt's statement to Harrison).

—Three are missing and unaccounted for (Eiselt, Boley and Riggins No. 2).

When attempts were made to explain these discrepancies, i.e., to explain why the reports did not state that respondent had uttered the racial epithets, if, in fact, he had, any residual credibility of these witnesses was dissipated. Supervisor Melnikof's testimony is a good example.

At the trial Melnikof testified:

—"he told her that she tore my fucking bag! 'You tore my fucking bag.' And he went crazy." (N.T. 200)

—"Finally he says, 'Yeah, right, a fucking nigger. You're in charge!'" (N.T. 201)

—"He said, 'See what happens when you give a fucking nigger a job.'" (N.T. 203)

—"Mr. Manning's wife and son, they were saying, 'Fucking nigger, fucking nigger,' to Ursula. They had their middle fingers up and stating, 'fucking nigger.' She went crazy. She jumped off the x-ray. She said, 'I'm going to kick your ass.'" (N.T. 204)

In his report Melnikof wrote:

> "Back at the podium his wife and son were making obscene gestures and stating these words (fucking nigger) ... Mr. Manning himself states and I quote—'See what happens when you give a black person a job—unquote.'" (R–5)

Melnikof's explanation for having attributed the words "black person" to respondent in his statement rather than "fucking nigger" was because he did not know respondent was a judge when he wrote the report.

Q. What is inaccurate about it?

A. I stated black person. It wasn't. He called her a fucking nigger.

Q. Why did you write it in your report as black person?

A. When I wrote that report, I didn't know he was a criminal judge. I didn't know this. (N.T. 214)

But then he testified that the reason he had deliberately attributed the inaccurate quote to respondent was because he *did* know respondent was a judge. Examination by Board counsel was as follows:

Q. ... So you're saying you changed the report or you didn't change it? The report is what it is, correct, or is this a second version of the report?

A. No, no, no. He called her a fucking nigger, but I didn't want to do that because I didn't want to go against a criminal judge.

Q. Why didn't you want to do that?

A. How you going to beat a criminal judge? (N.T. 214–215)

Then he testified that he *did not* know.

Q. Sir, you just testified when you did the report you didn't know he was a judge.

A. I didn't know. (N.T. 215)

Then he testified that he *did* know.

Q. When did you find out he was a judge?

A. This was four or five hours later.

. . .

Q. Four or five hours later you found out he was a judge?

A. Uh-huh.

Q. Then you wrote the report?

A. That's after PDS Riggins told me and so did Bridget Eiselt that he was a judge.

Q. Listen to my question. This report was written before you found out he was a judge. You wrote it about 5:30 isn't that right?

A. I wrote this after I found out he was the judge. (N.T. 215–216)

So, Melnikof testified that he found out respondent was a judge *before* he wrote the report and *after* he wrote the report. Apparently realizing, on questioning by Judge Weinberg, that the two versions were not exactly compatible, Melnikof testified that he found out respondent was a judge *while* he was writing the report.

JUDGE WEINBERG: At the time you wrote it you didn't know he was a criminal judge. You then said Ursula said to you after she read the statement, this is not right. He called me different language. She told you at that time that he was a criminal judge; is that correct?

A. She told me while I was writing it. (N.T. 222–223)

But Melnikof had testified he was alone when he wrote the report.

Q. Am I correct that you previously stated nobody was there when you wrote it?

A. I'm getting confused myself here.

Q. That's what you said; right?

A. Right.

Q. And that's the truth?

A. Right. (N.T. 223)

In their reports Matich and Grove stated that respondent had made "racial remarks." However, Grove's report attributes the use of the word "nigger" to "the man's wife" only. Matich testified that he did not discuss what happened with anyone, including Ursula Riggins, prior to writing his report but he obviously did speak with others because his report contains allegations of various things that were said which he, admittedly, did not hear.

Aiello also testified that he did not discuss what happened or review any other reports before he prepared his report yet his report states:

"I agree with Ursula on her report up to where she told the gentleman to pick up his garment bag." (R–7)

In addition, Aiello testified at the trial that he heard respondent call Riggins "a fucking nigger," yet his report, after stating that he agreed with Ursula's report "up to where she told the gentleman to pick up his garment bag" (up to which point Ursula's report said nothing about racial epithets), concludes:

I then went back to handling the Mag and therefore cannot attest to the actions that followed.

The Board's final witness, Wayne Boley, testified at the trial that he heard respondent say "when a nigger has a job they think they rule the world." However, Boley agreed that the report of an interview he gave to county detectives in February, 1996 "doesn't indicate that you made that statement that you've said here under oath at all." In addition, Boley handed in a written report two days after the incident but this was not produced at the trial and Boley testified: "I have not seen it since the day I wrote it."

It is not an esoteric concept that an account of an event given contemporaneously with its occurrence should count for more among the resources of the fact finder than one given some time later. Contemporaneous accounts of events come clothed with much of the same likelihood of truthfulness by which we justify the admission of "res gestae" hearsay utterances. The events have just occurred; there has not been time for other images to crowd the mind of the witness, nor for other agendas to develop.

In this case, for these witnesses, another agenda did develop: they were going to be on television—but only if it was a judge who had made the offensive remarks. There was no "story" otherwise. Even if his companion had made the remarks, this would not have been "news," for everybody knows that one cannot control what his or her companion, or fiancée, or spouse might say. Once committed to a description of events which provided a "story" for television there was no turning back for these witnesses—irrespective of the fact that the "story" was directly controverted by written statements contemporaneously made, most notably that of Riggins herself.

Respondent presented a number of "character witnesses" to attest to his good reputation. Our Supreme Court has written, on a number of occasions, of the role to be played and the weight to be accorded such evidence. That Court, in *Commonwealth v. Scott,* 496 Pa. 188, 195, 436 A.2d 607, 611 (1981), unanimously held that "[a] defendant is entitled to a charge that character evidence alone may be sufficient to raise a reasonable doubt and justify an acquittal of the charges." In *Commonwealth v. Castellana,* 277 Pa. 117, 121 A. 50 (1923), the Supreme Court held that evidence of good reputation "is substantive evidence to be weighed and considered in connection with the other evidence in the case." This evidentiary principle is embedded in our jurisprudence. See *Commonwealth v. Stoner,* 265 Pa. 139, 143, 108 A. 624, 625 (1919) ("Good character is of importance in this: that it may, in itself, in spite of evidence to the contrary, raise a reasonable doubt in the minds of the jury and so produce an acquittal.") and *Commonwealth v. Cleary,* 135 Pa. 64, 82–83, 19 A. 1017, 1018 (1890) ("Evidence of good character ... may of itself, by the creation of a reasonable doubt, produce an acquittal.") The Supreme Court, speaking by Justice James McDermott, described the nature of character or reputation evidence in the following manner:

"To offer evidence of an otherwise unblemished life is not a plea of mercy. It is, in fact, to be weighed against any present

allegation to the contrary. Character evidence may give a name to damning combinations different than what they seem, and be the truth that sets one free."

See *Commonwealth v. Neely*, 522 Pa. 236, 239, 561 A.2d 1, 2 (1989).

In the *Neely* case, the Supreme Court observed that "the value of a good reputation has been highly regarded since antiquity" and cited various scholars, philosophers and writers including, for example, Shakespeare: "Good name in man and woman, dear my lord, is the immediate jewel of their souls ..." Othello, Act iii, sc. 3, In 155, before declaring:

> Often a person takes a lifetime to build his or her reputation and when the dark clouds of life gather, one's reputation may be all that one has to ward off the impending downpour and at that moment it may be the only beacon of truth—truth is reputation's reward. A criminal defendant must receive a jury charge that evidence of good character (reputation) may, in and of itself, (by itself or alone) create a reasonable doubt of guilt and, thus, require a verdict of not guilty.

*Id.*, at 241, 561 A.2d at 3.

The quite compelling array of sixteen character witnesses presented by respondent, included assistant district attorneys and public defenders of Allegheny County who have appeared in many cases before respondent, a former law clerk, a former United States Attorney for the Western District of Pennsylvania, the present United States Attorney for the Western District of Pennsylvania, the President of the Pennsylvania Bar Association, a former Attorney General of Pennsylvania, and two eminent leaders of the civil rights movement in Pittsburgh, all of whom testified to his excellent reputation for racial impartiality and even-handedness in the performance of his judicial duties.

Weighing and considering this evidence, as the Supreme Court has abjured us to do, in connection with the other evidence in the case, we conclude that the Board did not sustain its burden of establishing by clear and convincing evidence the charges made in Part B of its Complaint.[6]

## IV. CONCLUSIONS OF LAW

### PART A

1. The Board has not established by clear and convincing evidence the allegations set out in Part A of the Complaint.

### PART B

2. The Board has not established by clear and convincing evidence the allegations set out in Part B of the Complaint.

### ORDER

PER CURIAM.

AND NOW, this 9th day of April, 1998, based upon the Opinion filed herewith, it is hereby ORDERED:

> That, pursuant to C.J.D.R.P. No. 503, the attached Opinion with Findings of Fact and Conclusions of Law be and it is hereby filed, and shall be served upon the Judicial Conduct Board and upon the Respondent,
>
> That, either party may elect to file written objections to the findings and conclusions of the Court, stating therein the basis for those objections, provided that such objections shall be filed with the Court within ten (10) days of the date of the entry of this Order, and a copy thereof served upon the opposing party,
>
> That, in the event such objections are filed, the Court shall determine whether to entertain oral argument upon the objections, and issue an Order setting a date for such oral argument, and
>
> That, in the event that timely objections are not filed within ten (10) days, or the

---

6. The same weight and consideration was given to this evidence in our disposition of the charges contained in Part A of the Board's Complaint.

Court decides that oral argument shall not be presented, this Court will issue an Order dismissing the Board's Complaint.

McEWEN, P.J., did not participate in the consideration or disposition of this case.

WEINBERG, J., dissents.