In re Shirley Rowe TRKULA, District
Justice in and for Magisterial
District 05–2–25.

No. 7 JD 96.

Court of Judicial Discipline
of Pennsylvania.

June 27, 1997.

**4**

Before McEWEN, President Judge, and McCLOSKEY, CASSEBAUM, MAGARO, MESSA, SYLVESTER, WEINBERG and SWEENEY, JJ.

## I. *INTRODUCTORY SUMMARY*

McCLOSKEY, Judge.

The Judicial Conduct Board (Board) filed a Complaint with this Court against District Justice Shirley Rowe Trkula (Respondent). The Complaint consists of ten Counts based upon allegations that (1) the Respondent had improperly contacted the Supervisor of the Statutory Appeals Unit of Allegheny County regarding a defendant who had appealed to that unit from a sentence the Respondent had imposed upon him (paragraphs 1–11 of the Complaint and Counts 1–6) and (2) had made false statements to representatives of the Federal Bureau of Investigation concern-

ing contact with the Supervisor (paragraphs 13–15 of the Complaint and Counts 7–10).

The Board and the Respondent have submitted stipulations of fact in lieu of trial under C.J.D.R.P. No. 502(D)(1), and a waiver of trial. The Court hereby accepts those stipulations of fact in pertinent part, recited below, as the facts necessary for disposition of this case.

## II. *FINDINGS OF FACT*

1. The Judicial Conduct Board is empowered by Article V, § 18 of the Constitution of the Commonwealth of Pennsylvania to file formal charges alleging conduct proscribed by that section on the part of judges, justices or justices of the peace (district justices) and to present the case in support of the formal charges before this Court.

2. District Justice Shirley Rowe Trkula is the duly-elected district justice serving Magisterial District 05–2–25, which is located in Allegheny County, Pennsylvania. Magisterial District 05–2–25 encompasses the Townships of Moon, Crescent, and Neville, and the Borough of Coraopolis.

3. Respondent commenced her judicial service by appointment on January 7, 1991, and she continues to serve as district justice at this time.

4. On February 25, 1993, John Eric Bubeck appeared before the Respondent for a hearing on two citations (Citation No. 1129068N charging disorderly conduct, and Citation No. 1129069N charging harassment).

5. After the hearing Bubeck was found guilty and sentence was imposed by Respondent.

6. The aggregate sentence imposed was to serve a ninety day term of imprisonment, which was suspended, and to pay a fine of $100 and costs of prosecution.

7. On March 16, 1993, Bubeck filed a notice of appeal from summary conviction to the Common Pleas Court of Allegheny County, pursuant to Pa.R.C.P. 86, and on March 18, 1993, the Respondent's office received notice of that appeal.

8. At that time, appeals from summary convictions in Allegheny County were heard by a special Statutory Appeals Unit located at Courtroom No. 822, 8th Floor, City–County Building, Pittsburgh, Pennsylvania. Walter "Bo" Cross was the Supervisor of the Appeals Unit.

9. The Respondent, although she had never met Cross face to face, knew Cross from dealing with him on the telephone concerning appeals and related matters in her court. On March 22, 1993, the Respondent telephoned Cross regarding her appeal of John Bubeck. At that time, the Federal Bureau of Investigation was conducting an investigation of allegations concerning the Statutory Appeals Unit of Allegheny County and recorded that conversation by the use of interceptive devices and prepared a transcript of that conversation as follows:

Walter "Bo" Cross: "—Appeals."

Shirley Trkula: "Bo?"

Cross: "Yeah."

Trkula: "Hi, how are you?"

Cross: "Wonderful."

Trkula: "This is Shirley Trkula."

Cross: "Yeah, Sh—Justice, how are ya?"

Trkula: "I'm fine, I'm fine."

Cross: "What can we do for ya?"

Trkula: "Well... I don't wanna call, but I have th—I had this crazy person in my court, and I was gonna put him in jail—"

Cross: "All right."

Trkula: "—but I was bein' nice."

Cross: "Go 'head."

Trkula: "Now he has the ball to a—to appeal this."

Cross: "All right."

Trkula: "He kept this little kid in the house."

Cross: "Um hm."

Trkula: "Against his will for—"

Cross: "Okay."

Trkula: "—five minutes, so. He's havin' a hearing, the S—it SA eight nineteen."

Cross: "SA eight nineteen of ninety-three?"

Trkula: "Right. And the hearing date is April 13th."

Cross: "April 13th."

Trkula: "Yeah, his name is—"

Cross: "Defendant's—"

Trkula: "—John Bubeck."

Cross: "Oh!"

Trkula: "B as in boy, u—"

Cross: "Uh—"

Trkula: "—b as in boy, e-c-k."

Cross: "Bubeck. Do you want him—"

Trkula: "I, I was gonna put the son of a bitch in jail!"

Cross: "Well, we might just do that here."

Trkula: "I was gonna say, uh—"

Cross: "Yeah."

Trkula: "—you can, because they were non-traffic, and he held this kid. The kid—"

Cross: "He held this kid in the, in the, in the house?"

Trkula: "In his house! I said, after the hearing, I told him, I said, if that was my son, I'd have been down there with a gun."

Cross: "Well Shirley, I guarantee the judge will listen to this very carefully."

Trkula: "Very—yea, just—just r—listen to it—"

Cross: "Oh we will. Yeah, we will."

Trkula: "—very carefully."

Cross: "Yeah."

Trkula: "Hey, how's everything else goin' ?"

Cross: "Good. You don't care if he goes away then, for a couple days, then."

Trkula: "You can—uh—I should have done it here."

Cross: "Well then, he may just get it here, Shirley."

Trkula: "Because I told him, you don't realize—"

Cross: "Yeah."

Trkula: "—you don't realize how awful that is, to (Unintelligible)."

Cross: "Well, if he did that, the judge— I'm sure the judge will, uh—"

Trkula: "The kid was so scared—"

Cross: "Right."

Trkula: "—he peed his pants!"

Cross: "Oh my God! Well—"

Trkula: "And he said he brought him in to take care of him, now that wasn't true at all."

Cross: "No, we'll—if the judge hears that case, he may just put him away."

Trkula: "Well just tell him to listen to it very carefully."

Cross: "This is Magistrate Trkula, judge."

Raymond L. Scheib [one of the judges of the Statutory Appeals Unit]: "Yeah."

Cross: "She had a goofball up there, and, he took an appeal on one of her cases, comin' up in April 13th. This guy held this little kid at the house against his will."

Scheib: "Uh oh."

Cross: "And she cut him a break. She didn't wanna . . ."

Scheib: "Um."

Cross: "She figured he wouldn't appeal it. So he took an appeal on her decision."

Trkula: "I gave him a ninety-day suspended sentence, is what I did."

Cross: "He—he—she gave him a ninety-day suspended sentence. I said, you may unsuspend that, right?"

Scheib: "You're damn right (Unintelligible)."

Cross: "He said he may unsuspend that!"

Trkula: "Good!" (Laughs)

Cross: "All right?"

Trkula: "Okay, Bo—"

Cross: "Okay, Shirley."

Trkula: "I knew I could count on you and Judge Scheib."

Cross: "Uh—you will, don't worry, you can count on Judge Scheib, he don't like that."

Trkula: "Thanks (Unintelligible)."

Scheib: "No!"

Cross: "All right, Shirley."

Trkula: "I'll see ya."

Cross: "Bye bye."

Trkula: "Bye bye."

10. The telephone call was made by the Respondent in order to influence the outcome of and impact upon the lawful appeal of

John Bubeck, and to secure a decision adverse to him.

11. Bubeck was never advised of this conversation.

12. In the course of the aforementioned F.B.I. investigation, Special Agents Robert M. Ellis and Larry Frank Juliano, of the Federal Bureau of Investigation, interviewed the Respondent on July 29, 1993, regarding her handling of the Bubeck case.

13. During the course of the aforementioned interview, the Respondent told these agents that she had not contacted Walter "Bo" Cross, or anyone else in the Statutory Appeals Unit concerning Bubeck's appeal. The Respondent knew the aforementioned statements were false and made these statements with the intent to mislead the agents and to impede the official investigation in which they were engaged.

## III. DISCUSSION

### PART A

The Board has charged that the conduct of the Respondent set out in Part A of the Complaint subjects her to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution because that conduct constitutes:

1. such that brings the judicial office into disrepute (Count 1),

2. such that prejudices the proper administration of justice (Count 2),

3. a violation of Rule 1 of the Rules Governing Standards of Conduct for District Justices (Count 3),

4. a violation of Rule 2A of the Rules Governing Standards of Conduct for District Justices (Count 4),

5. a violation of Rule 4A of the Rules Governing Standards of Conduct for District Justices (Count 5),

6. a violation of Rule 4D of the Rules Governing Standards of Conduct for District Justices (Count 6).

We will address these six Counts in the order in which the Board has recited them.

*COUNT 1.* Conduct which brings the judicial office into disrepute.

■ In *In re Smith*, 687 A.2d 1229 (Pa.Ct. Jud.Disc.1996), this Court noted that the conduct of a judge which results in a decline in the public esteem for that judge, may not support the conclusion that the conduct has brought the judiciary as a whole into disrepute, absent a persuasive showing by the Board that the conduct is so extreme as to have brought the judicial office itself into disrepute. In *In re Cicchetti*, slip op. at 26–27, 697 A.2d 297, 310 (Pa.Ct.Jud.Disc.1997), this Court reiterated that notion as it concluded that a judge's conduct in persisting in making sexual advances towards a subordinate employee who repeatedly rejected the advances constituted conduct of such an extreme nature that the judicial officer had brought the judicial office itself into disrepute.

■ In *Cicchetti*, 697 A.2d at 312, this Court noted that:

The determination of whether particular conduct has brought the judicial office into disrepute, of necessity, is a determination which must be made on a case by case basis as the particular conduct in each case is scrutinized and weighed.

In this case, the stipulated facts establish that Respondent telephoned the Statutory Appeals Unit of Allegheny County and spoke to the Unit Supervisor and one of the judges "in order to influence the outcome of and impact upon Bubeck's lawful appeal [from Respondent's finding of guilt,]" (Stipulation of Fact 10).

In *Smith* we said that:

"Disrepute" necessarily incorporates some standard with regard to the reasonable expectations of the public of a judicial officer's conduct.

*Smith, supra,* at 1239.

Certainly the reasonable expectations of the public would include the expectation that a judicial officer will not make an overt, *ex parte* attempt to influence the outcome of a case on appeal from his or her court, to the detriment of the appellant. Such conduct subverts the appellate process, an integral

part of our adjudicatory system. It would be difficult to identify conduct which would more assuredly dash public confidence in that system and in the judicial office itself.

We conclude that the conduct of Respondent was so extreme as to bring the judicial office into disrepute. *See, Cicchetti,* 697 A.2d at 312 and *Smith, supra,* at 1238.

***COUNT 2.*** Conduct which prejudices the proper administration of justice.

■ This Court has held that:

Conduct which prejudices the proper administration of justice . . . is conduct which obstructs or interferes with those activities which enable the systematic operation of the courts. The term "systematic operation" encompasses not only the procedures adopted by the courts which aid in functioning, but also the standards of conduct expected of judicial officers in the performance of the work of the courts. Hence, when a judicial officer's conduct departs from the standard expected of judges and has the effect of obstructing or interfering with the systematic operation or normal functions of the court, his conduct *will have affected* the proper administration of the courts. (Emphasis added.)

*Smith, supra,* at 1237.

It is certainly without question that when Respondent called the Supervisor of the Statutory Appeals Unit and also spoke with one of the judges of that Unit, she was "interfering with the systematic operation or normal functions of the court" and as we said in *Smith* "[such] conduct will have affected the proper administration of the courts."

Again we refer to *Smith,* where we said:

A judicial officer who engages in conduct which prejudices the proper administration of justice would have the added element of a mental state in which he or she not only knew that the conduct at issue consisted of some neglect or impropriety, *but also acted with the knowledge and intent that the conduct would have a deleterious effect upon the administration of justice, for*

*example, by affecting a specific outcome.* (Emphasis added.)

*Id.* at 1238.

■ Review of the transcript of the telephone conversation Respondent had with the Unit Supervisor and one of the Unit Judges (Stipulated Findings of Fact 9) reveals that, in placing the call, Respondent had no other purpose than to "[affect] a specific outcome" and that, in placing the call, she "acted with the knowledge and intent that the conduct would have a deleterious effect upon the administration of justice." There is no doubt that Respondent intended that her phone call have a deleterious effect on the administration of justice and intended that it would prejudice the right of the appellant to have his appeal heard on its merits and without interference.

We are mindful that in *Smith,* we held that the respondent had not engaged in conduct which prejudices the proper administration of justice. *Id.* at 1238. In that case, however, the conduct with which the respondent had been charged was failure to render decisions in a timely manner, and there was no evidence that the respondent's delayed dispositions arose out of or were associated with any intent to effectuate a particular outcome. As a result, we held that, in such case, the judge "did not intend to obstruct or interfere with the administration of justice." *Id.* and accordingly concluded that the respondent had not engaged in conduct which prejudices the proper administration of justice. The facts of *Smith* did not establish that "added element of a mental state in which he or she . . . acted with the knowledge and intent that the conduct would have a deleterious effect upon the administration of justice." In this case, as pointed out above, the Respondent did act with that proscribed knowledge and intent.

***COUNT 3.*** Violation of Rule 1 of the Rules Governing Standards of Conduct for District Justices.

■ In the past we have dealt with charges of violations of Canon 1 of the Code of Judicial Conduct, which is identical to Rule 1, in a manner consistent with the holding of the Supreme Court of Pennsylvania in *In the Matter of Larsen,* Appendix I, 532 Pa. 326,

616 A.2d 529 (1992). We intend to continue to follow that holding which was expressed as follows at 532 Pa. at 385, 616 A.2d at 558.

Canon 1 is primarily a statement of purpose and rule of construction, rather than a separate rule of conduct. It requires that each of the other Canons be construed in accordance with the Code's fundamental purpose of ensuring both the independence and the integrity of the judiciary.

We recognized this interpretation of Canon 1 in *Smith, supra,* at 1239 and most recently in *In re Cicchetti,* 697 A.2d at 313, for we stated:

The language in Canon 1 is hortative and goal oriented, and does not set forth with specificity, the precise nature of the conduct and standards to which it is aimed.

*Smith, supra,* at 1239; *Cicchetti,* 697 A.2d at 313.

In addition, the Supreme Court in *Larsen* went on to state:

To the extent Canon 1 has been construed to set forth independent rules of conduct, we find none of those rules implicated by Justice Larsen's alleged tip to Judge Ross.

*In the Matter of Larsen,* 532 Pa. at 385, 616 A.2d at 558.

This finding of the Supreme Court prompts two observations:

1. The Board has not advised us of any cases where Canon 1 has been construed as setting forth independent rules of conduct[1]—nor have we found any—at least in Pennsylvania after *Larsen,* unless the Supreme Court changed its position on Canon 1 after *Larsen,* which it has not.

2. The Supreme Court found that, if there were any such rules, they were not implicated by Justice Larsen's *ex parte* communication in that case. We see no reason why the Supreme Court would—or this Court should—view Re-

spondent's *ex parte* communication in this case any differently.

Thus, we conclude that Respondent's conduct does not constitute a violation of Rule 1.

*COUNT 4.* Violation of Rule 2A of the Rules Governing the Standards of Conduct for District Justices.

 Rule 2A of the Rules Governing the Standards of Conduct for District Justices provides:

Rule 2. Impropriety and Appearance of Impropriety to be Avoided, Voluntary Appearance as Character Witness Prohibited

A. A district justice shall respect and comply with the law and shall conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. A district justice shall not allow his family, social or other relationships to influence his judicial conduct or judgment. He shall not lend the prestige of his office to advance the private interest of others, nor shall he convey or permit others to convey the impression that they are in a special position to influence him.

Rule 2A and Canon 2 of the Code of Judicial Conduct are of the same content. The Rule follows the Canon almost word for word, and thus interpretations of Canon 2 by our Supreme Court provide guidance for this Court in applying Rule 2A.

Our Supreme Court, in *In the Matter of Larsen, supra,* at 386, 616 A.2d at 559, stated:

While this issue has not been addressed in any of the published opinions our Supreme Court has issued on judicial ethics matters, it is clear that an *ex parte* communication by one member of the judiciary to another member of the judiciary may constitute censurable misconduct in Pennsylvania.

---

1. The Board has cited *Matter of Benoit,* 523 A.2d 1381 (Me.1987) apparently to support its position that Canon 1 establishes independent rules of conduct. *Matter of Benoit* does no such thing, however. The case holds that Canon 1 does not set out any independent rules of conduct and that any violations of Canon 1 derive from violations of other Canons. Our Supreme Court could have chosen this approach to Canon 1 by holding, as the Maine Court has, that violations of other Canons are automatic, derivative, "by definition" violations of Canon 1; but it did not.

The Supreme Court held that Justice Larsen's *ex parte* communication to Judge Ross concerning a case then pending before her was a violation of Canon 2. The Court so held even though it found that Justice Larsen made the communication with no improper motive

because the conduct by itself raised an appearance of impropriety, which could undermine public confidence in our judiciary.

*Id.* at 391, 616 A.2d at 562.

We conclude, therefore, that Respondent violated Rule 2A by making an *ex parte* communication to the Unit Supervisor of the Allegheny County Statutory Appeals Unit concerning the Bubeck case, which was then pending in that court. Of course, in this case, the Respondent's motive in making the communication was improper.

*COUNTS 5 and 6.* Violation of Rules 4A and 4D of the Rules Governing Standards of Conduct for District Justices

■■ Rules 4A and 4D provide:

Rule 4. Adjudicative Responsibilities.

A. A district justice shall be faithful to the law and maintain competence in it. He shall be unswayed by partisan interests, public clamor or fear of criticism.

D. A district justice shall accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding. A district justice, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding before him if he gives notice to the parties of the person consulted and the substance of the advice and affords the parties reasonable opportunities to respond.

Rule 4, as stated in its heading, deals with conduct related to the "Adjudicative Responsibilities" of a District Justice. Since the conduct at issue here does not relate to Respondent's adjudicative responsibilities, we conclude that Respondent has not violated Rule 4A or 4D.

**2.** Rule 4D and Canon 3(A)(4) are identical.

Moreover, the holding of the Supreme Court of Pennsylvania in *Larsen* would control our consideration of Respondent's alleged violation of Rule 4D. The charge in *Larsen* averred that Justice Larsen's *ex parte* communication to Judge Ross constituted a violation of Canon 3(A)(4).[2] The Supreme Court rejected that charge and held in quite succinct terms

Any perceived applicability of Canon 3(A)(4) to this case is wholly illusory. Indeed, *Canon 3(A)(4) by its express terms relates to Judge Ross' duties and obligations* in the scenarios set forth in the allegations. Under Canon 3(A)(4) any judge *presiding in a case* has an obligation not to consider *ex parte* communications such as those which Justice Larsen was alleged to have provided Judge Ross. Canon 3(A)(4) is inapplicable here. (Emphasis added.)

*Larsen, supra,* at 385, 616 A.2d at 559.

Thus, Respondent's conduct did not constitute a violation of Rules 4A or 4D (or 4B or 4C for that matter) for it is quite clear based on the *Larsen* case, as well as on the heading of the Rule and the language of the Rules themselves, that the conduct proscribed by Rules 4A, B, C and D is indeed limited to the adjudicative responsibilities of a district justice.

### PART B

In part B the Board charges Respondent with making false statements to two agents of the Federal Bureau of Investigation who were conducting an investigation of the Statutory Appeals Unit of Allegheny County. Respondent told the agents that she had not contacted the Supervisor of the Unit concerning Bubeck's appeal. It is stipulated that "Respondent knew the aforementioned statements were false and made these statements with the intent to mislead the agents and to impede the investigation in which they were engaged." (Stipulation of Fact 15.)

The Board charges that the making of the aforesaid false statements subjects Respondent to discipline under Article V, § 18(d)(1)

of the Pennsylvania Constitution because that conduct constitutes:

1. such that brings the judicial office into disrepute (Count 7),
2. such that prejudices the proper administration of justice (Count 8),
3. a violation of Rule 1 of the Rules Governing Standards of Conduct for District Justices (Count 9),
4. a violation of Rule 2A of the Rules Governing Standards of Conduct for District Justices (Count 10).

Because there is a commonality in what we have to say about the applicability of these charges to the conduct involved, we will treat them together.

 Our Supreme Court was faced with charges involving identical conduct in *In the Matter of Glancey*, 518 Pa. 276, 542 A.2d 1350 (1988). In that case, Judge Glancey was charged with improperly accepting a $300 cash gift (which the Court found he had accepted) (the "underlying conduct") and then denying its receipt to FBI agents who were conducting an investigation of the underlying conduct. The only violation found by the Court to have resulted from the giving of the false statement was a violation of Canon 2 of the Code of Judicial Conduct.[3]

The Supreme Court makes a reference to Canon 1 in the course of its treatment of the ethical violations flowing from Judge Glancey's utterance of false statements in the course of an official investigation. Insofar as such reference might be considered an indication that the Supreme Court regarded this conduct as a violation of Canon 1, we are constrained to follow the more recent and much more explicit manifestation of the view of the Supreme Court concerning Canon 1 as expressed in *In the Matter of Larsen, supra*, at 383–85, 616 A.2d at 558. Thus, we conclude that Respondent's making a false statement to FBI agents did not constitute a violation of Rule 1 of the Rules Governing Standards of Conduct for District Justices.

 With respect to Canon 2, however, we follow the holding of the Supreme Court in *Glancey* that the identical conduct did constitute a violation of Canon 2. It is appropriate here to refer to the rationale of the Supreme Court in *Glancey*. Judge Glancey contended that he should not be subject to sanction for providing an untruthful exculpatory response to an accusatory inquiry propounded by FBI agents, relying for his contention on the fact that the federal criminal law prohibiting false statements to federal agents (18 U.S.C. § 1001) does not apply to investigations where the respondent has provided nothing more than an exculpatory negative response. Judge Glancey argued that the federal cases establish that, since the "simple denial is not made under oath, it should not be punished if untruthful so as to protect the unwitting citizen from the extreme pressure a federal investigation might engender." *Glancey, supra*, at 287, 542 A.2d at 1355. The Supreme Court stated, nevertheless,

> Notwithstanding the development of the "exculpatory no" doctrine in federal law, we believe such a response given by a judge of the court system in this Commonwealth warrants discipline.

Elaborating on this holding, the Court noted that the Code of Judicial Conduct is not limited in its application to criminal conduct and specifically referred to the commentary to Canon 2 which provides that "[a] judge must avoid all impropriety and appearance of impropriety."

The Court also rejected the Respondent's argument that he should not be deprived of the "right" to provide an exculpatory, albeit untruthful, response to questioning by federal agents because he too is a citizen. On this point the Court turned again to the commentary to Canon 2 and stated:

> We find it clearly states that a judge must "accept restrictions on his conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly."

*Id.* at 287–88, 542 A.2d at 1356.

We are aware that the Respondent in the case before this Court is a district justice—

---

3. As we earlier stated, Canon 2 of the Judicial Conduct is worded almost identically as Rule 2A of the Rules Governing Standards of Conduct for District Justices.

not a judge, as was the respondent in *Glancey*. We are aware that she is not presumed to be "learned in the law" as was Judge Glancey. Nevertheless, the commentary to Rule 2 of the Rules Governing the Standards of Conduct for District Justices is identical to the language of the commentary to Canon 2 of the Code of Judicial Conduct quoted and relied upon in *Glancey*. Therefore, we conclude that the same standard which was applied by the Supreme Court in *Glancey* should be applied to the same conduct in this case.

■ Finally, the Board has charged that Respondent's conduct in making untruthful statements to the FBI agents was such that:

a. brought the judicial office into disrepute, and

b. prejudiced the proper administration of justice.

Since the Supreme Court implicitly found that identical conduct in *Glancey* supported neither charge, we conclude that it supports neither charged here.

We recognize that the Supreme Court in *Glancey* did not specifically hold that providing untruthful statements to FBI agents was not such conduct as brought the judicial office into disrepute or prejudiced the proper administration of justice. Indeed, it did not discuss the issue and, as a matter of fact, Judge Glancey was not even faced with those charges. Nevertheless, as the Supreme Court made clear in its opinion in *Glancey*, that Court will not be deterred from finding a respondent's conduct has violated a particular constitutional proscription merely because the conduct has not been characterized by the Board as a violation of that particular proscription.

Judge Glancey was charged with violating Article V, § 17(b) of the Constitution but the Supreme Court found that his acceptance of the cash gift constituted a violation of § 17(c). The Court stated:

> Nor do we find merit in Respondent's contention that our finding his conduct violative of section 17(c), *for which he has not been charged*, would contradict basic notions of due process. In *Cunningham* we considered this argument and rejected it.

> "The fact that the Board was concerned primarily with § 17(b) and the provisions of the Code promulgated thereunder *does not preclude this Court from making a finding of a violation under § 17(c) if the record warrants such a finding ... Cunningham*, 517 Pa. at [429], 538 A.2d at 479." (Emphasis added.)

*Glancey, supra*, at 285–86, 542 A.2d at 1355.

Just as the Supreme Court in considering Judge Glancey's conduct in accepting the $300 gift, was "not preclude[d] from making a finding of a violation under § 17(c) if the record warrant[ed] such a finding" even though Judge Glancey had not been so charged, the Supreme Court, in considering Judge Glancey's conduct in making false statements to the FBI, was not precluded from making a finding of a violation under § 18(d)(1), i.e., that the conduct was such that brought the judicial office into disrepute or prejudiced the proper administration of justice, if the record warranted such a finding. Our conclusion, derived from the Court's failure to do so, is that the Supreme Court considered that the record did not warrant such a finding. The Supreme Court's declination in *Glancey* to find that identical conduct was such that (a) brought the judicial office into disrepute, and (b) prejudiced the proper administration of justice, leads us to decline to make such a finding in this case.

## IV. CONCLUSIONS OF LAW

### PART A

1. The Respondent's conduct with respect to her improper contact with the Allegheny County Statutory Appeals Unit constitutes:

a. such that brings the judicial office into disrepute,

b. such that prejudices the proper administration of justice,

c. a violation of Rule 2A of the Rules Governing Standards of Conduct for District Justices.

2. The Respondent's conduct with respect to her improper contact with the Allegheny County Statutory Appeals Unit does not constitute:

a. a violation of Rule 1 of the Rules Governing Standards of Conduct for District Justices,

b. a violation of Rule 4A or 4D of the Rules Governing Standards of Conduct for District Justices.

## PART B

3. The Respondent's conduct in providing false information to agents of the Federal Bureau of Investigation who were conducting an official investigation at the time constitutes a violation of Rule 2A of the Rules Governing Standards of Conduct for District Justices.

4. The Respondent's conduct in providing false information to agents of the Federal Bureau of Investigation who were conducting an official investigation at the time does not constitute:

a. such that brings the judicial office into disrepute,

b. such that prejudices the proper administration of justice,

c. a violation of Rule 1 of the Rules Governing Standards of Conduct for District Justices.

5. The Respondent is subject to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution.

## ORDER

AND NOW, this 27th day of June, 1997, based upon the Conclusions of Law, it is hereby ORDERED:

That, pursuant to C.J.D.R.P. No. 503, the attached Opinion with Stipulations of Fact and Conclusions of Law be and it is hereby filed, and shall be served on the Judicial Conduct Board and upon the Respondent

That, either party may file written objections to the Court's Conclusions of Law within ten (10) days of this Order. Said objections shall include the basis therefore and shall be served on the opposing party.

That, in the event that such objections are filed the Court shall determine whether to entertain oral argument upon the objections, and issue an Order setting a date for such oral argument, and

That, in the event objections are not filed, the Conclusions of Law shall become final, and this Court will issue an Order setting a date, pursuant to C.J.D.R.P. No. 504, for a hearing on the issue of sanctions.