**In re Peter Paul NAKOSKI, Jr., District Justice In and For Magisterial District 06–3–01.**

**No. 4 JD 98.**

Court of Judicial Discipline of Pennsylvania.

Oct. 19, 1999.

Before SYLVESTER, President Judge, and MESSA, McEWEN, SWEENEY, PANELLA, BYER and RUSSO, JJ.

SWEENEY, Judge.

## I. INTRODUCTION

The Judicial Conduct Board (Board) filed a Complaint with this Court against District Justice Peter Paul Nakoski, Jr. The Complaint contains five Counts based on allegations that, during a Criminal Law Review class which was given as part of the mandatory Minor Judiciary Continuing Education Recertification Program at Wilson College in Chambersburg, Pennsylvania on October 7, 1997, the instructor, in the course of discussing what constitutes probable cause for a stop and search, asked the class, "It's not unlawful or illegal to be a black man, is it?" and the Respondent answered, "Yes", and gave further response.

A trial was held on March 1, 1999 at which time testimony was taken and the Board and the Respondent furnished the Court with Stipulations of Fact which were made part of the record.

## II. FINDINGS OF FACT

This Court finds the following facts contained in the Stipulations of Fact submitted by the parties:

1. The Respondent is the duly-elected district justice serving Magisterial District 06–3–01, which encompasses the townships of Harbor Creek, Lawrence Park, and the Borough of Wesleyville in Erie County.

2. The Respondent commenced his judicial service on or about January 5, 1976. Respondent continues to serve as district justice at the present time. His current term ends in January 2000.

3. From October 6, 1997 through October 10, 1997, the Respondent attended the mandatory Minor Judiciary Continuing Education Recertification Program on the campus of Wilson College in Chambersburg, Pennsylvania. On October 7, 1997, the Respondent attended the Criminal Law Review/Update class taught by Attorney William Tully. No members of the general public attended the Criminal Law Review/Update class.

4. During the Criminal Law Review/Update class, Instructor Tully dis-

cussed with the class the Supreme Court case *Commonwealth v. Hawkins,* 547 Pa. 652, 692 A.2d 1068 (1997), where the Pennsylvania Supreme Court reversed the conviction of an African–American male for a violation of the Uniform Firearms Act because police lacked sufficient probable cause to make an arrest.

5. During the discussion of *Hawkins,* Attorney Tully asked the entire class the question, "It's not unlawful or illegal to be a black man, is it?"

6. The Respondent answered, "Yes", and provided further response. With regard to the remainder of the Respondent's answer, it is agreed that there were additional words spoken. However, there is no stenographic, audio, or video recording of his response.

7. The Respondent was never asked by the class instructor, Attorney Tully; the complaining district justice, Elizabeth Romig; or any other members of the class; the school administrators of the Minor Judiciary Education Board, including the executive director, Robert Hessler, his aides, servants, or employees to explain his answer. The Respondent was not contacted about this matter until June 8, 1998 when he received Exhibit 1, the Judicial Conduct Board Notice of Full Investigation.

8. The complaining district justice, Elizabeth Romig, is not of African–American decent. There were no African–Americans in the class, and no African–American has filed a complaint against the Respondent.

9. The Judicial Conduct Board is presently not in possession of any other evidence of the Respondent having a racial prejudice or racial bias, other than the Respondent's statements during the class in question.

10. Any knowledge of the Respondent's mental state concerning the existence of bias or prejudice at the time of the alleged subject utterances are based on the Respondent's conduct during the class in question.

11. Thirty-seven of the 48 district justices attending the subject Criminal Law Review class have made unsworn statements to the Judicial Conduct Board's chief investigator that either they have no remembrance or recollection of the Respondent making any statement or, if they did, what those utterances were.

In addition, this Court finds that:

12. After responding to instructor Tully's question, Respondent said some or all of the following: "They're all in jail. They're the ones doing all the robberies and burglaries."

13. There is no evidence, nor does the Board contend, that Respondent's execution of his judicial duties is in any way infected with racial bigotry. The evidence affirmatively establishes the contrary.

14. Respondent's reputation for fairness and racial evenhandedness in the discharge of his judicial duties is excellent.

### III. *DISCUSSION*

The constitutional amendment of 1993 establishing this Court provided certain specific instructions for the conduct of proceedings before this Court:

> All hearings conducted by the court shall be public proceedings conducted pursuant to the rules adopted by the court and in accordance with the principles of due process and the law of evidence. Parties appearing before the court shall have a right to discovery pursuant to the rules adopted by the court and shall have the right to subpoena witnesses and to compel the production of documents, books, accounts and other records as relevant. The subject of the charges shall be presumed innocent in any proceeding before the court, and the board shall have the burden of proving the charges by clear and convincing evidence.

Pa. Const. Art. V, § 18(b)(5).

The Pennsylvania Supreme Court has defined clear and convincing evidence as follows:

The witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.... It is not necessary that the evidence be uncontradicted ... provided it "carries conviction to the mind" or carries "a clear conviction of its truth."

*In re Adoption of J.J.,* 511 Pa. 590, 595, 515 A.2d 883, 886 (1986). See, also, *LaRocca Trust,* 411 Pa. 633, 640, 192 A.2d 409, 413 (1963).

Acting under the provisions of C.J.D.R.P. No. 501, the President Judge appointed a Panel to conduct the trial of this case. The Panel, consisting of Conference Judge Sweeney, Judge Panella and Judge Russo, conducted the trial on March 1, 1999. Findings of Fact were initially made by the Panel.

Since the Constitution requires that "all actions of the court ... shall require approval by a majority vote of the members of the court" the Panel's Findings of Fact have been reviewed and this Decision is rendered by the full Court. As we noted in *In re Manning,* 711 A.2d 1113, 1117 (Pa.Ct.Jud.Disc.1998), this Court is constrained to accord special deference to the findings of a Panel for, as the ones who hear the witnesses testify and observe their demeanor, it is they who are best positioned to assess credibility. Moreover, in this case, there is very little dispute as to the facts, most being the subject of stipulations.

The Board has charged that the Respondent's response to instructor Tully's question in the Criminal Law Review class for district justices subjects him to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution because that response amounts to conduct which:

1. is a violation of Rule 1 of the Rules Governing Standards of Conduct of District Justices (Count 1),
2. is a violation of Rule 2A of the Rules Governing Standards of Conduct of District Justices (Count 2),
3. is a violation of Article V, § 17(b) of the Pennsylvania Constitution (Count 3),
4. brings the judicial office into disrepute (Count 4), and
5. prejudices the proper administration of justice (Count 5).

We will address these Counts in the order listed above.

**COUNT 1.** Violation of Rule 1 of the Rules Governing Standards of Conduct of District Justices.

Rule 1 of the Rules Governing Standards of Conduct of District Justices provides:

An independent and honorable judiciary is indispensable to justice. A district justice should participate in establishing, maintaining and enforcing, and shall himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of these rules governing standards of conduct of district justices shall be construed and applied to further that objective.

■ We readopt and reaffirm what we said in *In re Trkula,* 699 A.2d 3 (Pa.Ct. Jud.Disc.1997), and repeated in *In re Strock,* 727 A.2d 653 (Pa.Ct.Jud.Disc.1998), namely:

In the past we have dealt with charges of violations of Canon 1 of the Code of Judicial Conduct, which is identical to Rule 1, in a manner consistent with the holding of the Supreme Court of Pennsylvania in *In the Matter of Larsen,* Appendix I, 532 Pa. 326, 616 A.2d 529 (1992). We intend to continue to follow that holding which was expressed as follows at 532 Pa. at 385, 616 A.2d at 558.

Canon 1 is primarily a statement of purpose and rule of construction, rath-

er than a separate rule of conduct. It requires that each of the other Canons be construed in accordance with the Code's fundamental purpose of ensuring both the independence and the integrity of the judiciary.

We recognized this interpretation of Canon 1 in *Smith, supra,* at 1239 and ... in *In re Cicchetti,* 697 A.2d at 313, for we stated:

> The language in Canon 1 is hortative and goal oriented, and does not set forth with specificity the precise nature of the conduct and standards to which it is aimed.

699 A.2d at 8–9.

The hortatory character of Canon 1 and Rule 1 is accented by the concluding line of each:

> The provisions of this Code should be construed and applied to further that objective. (Canon 1).
>
> The provisions of these rules ... shall be construed and applied to further that objective. (Rule 1).

Thus, Canon 1 and Rule 1 instruct that the canons and rules *which follow* are to be construed so as to further the objective set out in Canon 1 and Rule 1.

It is pointed out further that that objective, by itself, provides further support for the Supreme Court's interpretation of Canon 1 as "primarily a statement of purpose and rule of construction, rather than a separate rule of conduct." *Larsen, supra.* We believe that the objective set out in Canon 1 and Rule 1 that: "A judge [district justice] ... should [shall] observe high standards of conduct" is so vague and subject to such subjective and personalized interpretation as to be an impermissible standard for imposing sanctions. If this were "a separate rule of conduct", i.e., the observation of "high standards of conduct", it would present the same constitutional difficulties as use of the word "misconduct" as a standard has been held to present. *See, e.g., Giaccio v. Pennsylvania,* 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966) where the United States Supreme Court advised:

> If used in a statute which imposed forfeitures, punishments or judgments for costs, such loose and unlimiting terms [as "misconduct" or "reprehensible conduct"] would certainly cause the statute to fail to measure up to the requirements of the Due Process Clause.

*See, also, Soglin v. Kauffman,* 418 F.2d 163 (7th Cir.1969) and *Clark v. Weeks,* 414 F.Supp. 703 (N.D.Ill.1976).

The Board acknowledges our prior holdings that Rule 1 is not a separate rule of conduct and sets forth no independent grounds for disciplinary action, but asks that we reconsider this position in light of other decisions of the Supreme Court which can be said to hold that Canon 1 or Rule 1 had been violated and thus constitute ·a separate rule of conduct. The cases cited by the Board are: *Matter of Glancey,* 518 Pa. 276, 542 A.2d 1350 (1988); *Matter of Cunningham,* 517 Pa. 417, 538 A.2d 473 (1988); *Judicial Inquiry and Review Board v. Snyder,* 514 Pa. 142, 523 A.2d 294 (1987); *In re Dennis,* J.I.R.B. Docket No. 84 (Order filed June 22, 1977); *In re Kafrissen,* J.I.R.B. Docket No. 111 (Order filed December 4, 1986).

Review of those cases reveals that in *Kafrissen, Dennis, Cunningham* and *Glancey,* no analysis was made of the applicability of Canon 1 or Rule 1, the opinions containing merely a cursory reference to the Canon or Rule and then only in conjunction with other canons or rules. In *Snyder,* the Court does mention Canon 1 by itself, but in that connection refers to conduct which "brought discredit to himself and the judiciary in general"—conduct which is described, and proscribed, by the Constitution as "conduct which brings the judicial office into disrepute", rather than conduct which falls short of the "high standards of conduct" prescribed by Canon 1 (a standard which we believe would be considered unconstitutionally vague as pointed out above). Thus, we find *Snyder* unhelpful on the question of the applicabili-

ty of Canon 1 as a separate rule of conduct for the Court did not identify or address that as a question—as it did in *Larsen*. Moreover, we should mention that *Snyder's* conduct was so egregious that discussion of this question in that case would have been, essentially, gratuitous.

However one might view the cases cited by the Board, we do not consider them precedential on the question, for, in *Larsen*, the Supreme Court does specifically address the question, and *Larsen* is a later, and the latest, decision of the Supreme Court on the question. Furthermore, for the reasons stated earlier, we believe the view expressed in *Larsen* to be correct.

For these reasons we adhere to our decision to follow *Larsen*, as we did in *Smith, Cicchetti, Trkula,* and *Strock.*

**COUNT 2.** Violation of Rule 2A of the Rules Governing Standards of Conduct of District Justices.

Rule 2A of the Rules Governing Standards of Conduct of District Justices provides:

A district justice shall respect and comply with the law and shall conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. A district justice shall not allow his family, social or other relationships to influence his judicial conduct or judgment. He shall not lend the prestige of his office to advance the private interest of others, nor shall he convey or permit others to convey the impression that they are in a special position to influence him.

▉ After considering all of the evidence in this case, we find it difficult to find that the words spoken by Respondent in that classroom, to the extent that they can even be agreed upon, were, in that context, a manifestation of racial bias or that they were antithetical to the promotion of public confidence in the integrity and impartiality of the judiciary. Most poignantly, we find that the Board has not established that by clear and convincing evidence.

Let it be clear, however, that in so finding we in no way attenuate the reactions expressed by those district justices who testified in this case.[1] Nevertheless, though Respondent's response to the instructor's question may qualify as ill-advised—even oafish—we do not believe the evidence establishes that it is sanctionable—particularly when all of the evidence in the case is weighed.

We believe it is important that the response in question was made in the company of respondent's fellow district justices [2] —the only exception being the instructor. We think it is important that this witness, who was in control of the class and who was not just a casual observer of off-bench conduct, such as in a bar or other public place, did not regard the remarks as reportable to anybody, including the Supreme Court, the Judicial Conduct Board, or his supervisor. If he had regarded the response as creating the appearance of impropriety or as reflecting adversely on the impartiality of the judiciary, we believe Mr. Tully would have reported it—would have considered it his duty to do so particularly in view of his role as representative or agent of the Supreme Court at the time. Mr. Tully impressed us as a conscientious and reasonable man and one appreciative of his responsibilities as a member of the bar and as an instructor in the continuing education program for the minor judiciary.

Mr. Tully's testimony on the subject was pointed:

Q. ... if the comments were racially derogatory and you had recognized

---

1. The forty-eight district justice-students in the class include the eight who testified, the thirty-seven who had no recollection of the event, one who died, one who could not be found, and the respondent.

2. We note that of the forty-seven other district justices in the class only two considered reporting the incident to the Judicial Conduct Board or mentioning it to the authority conducting the program.

the comment as such, you would have addressed it then and there, would you have not?

A. In other words, if I felt that there was— If I immediately thought that there was malicious intent, yes, I would have addressed it or brought it to Mr. Hessler's attention.[3]

(N.T. 134–135.)

We are inclined to give credence to instructor Tully's reaction to Respondent's answer which he described as follows:

A. I formed an early impression that it was a bad attempt at humor . . .

(N.T. 135.)

Our reluctance to treat Respondent's response to the question as sanctionable is heightened because his response was altogether extemporaneous.

We call attention to the Board's candor with regard to the totality of the evidence of any racial bias possessed by Respondent which is set out in Stipulations Number 10 and 11:

Stipulation Number 10: The Judicial Conduct Board is presently not in possession of any other evidence of the Respondent having a racial prejudice or racial bias, other than the Respondent's statements during the class in question. Stipulation Number 11: Any knowledge of the Respondent's mental state concerning the existence of bias or prejudice at the time of the alleged subject utterances are based on the Respondent's conduct during the class in question.[4]

As stated earlier, we do not consider this evidence as establishing a violation of Rule 2A in accordance with the constitutional requirement that evidence of such a violation be "clear and convincing."

Moreover, there is, in this record, countervailing evidence on the question.

Respondent presented a number of "character witnesses" to attest to his good reputation for racial impartiality. We are guided by the instructions of our Supreme Court which, on numerous occasions, has spoken of the role to be played and the weight to be accorded such evidence. In *Commonwealth v. Scott*, 496 Pa. 188, 195, 436 A.2d 607, 611 (1981), the Supreme Court unanimously held that "[a] defendant is entitled to a charge that character evidence alone may be sufficient to raise a reasonable doubt and justify an acquittal of the charges." In *Commonwealth v. Castellana*, 277 Pa. 117, 123, 121 A. 50, 52 (1923), the Court, quoting *Commonwealth v. Howe*, 42 Pa.Super. 136, 144 (1910), held that evidence of good reputation "is substantive evidence to be weighed and considered in connection with the other evidence in the case."

Respondent presented the testimony of five character witnesses, four of whom were African–Americans. These included:

William Dixon, retired Major of the Pennsylvania State Police,

Greg Patterson, member of the Pennsylvania State Police,

Larry Meredith, Deputy Director of the John F. Kennedy Center in Erie, Penn-

**3.** Robert Hessler was the Executive Director of the Minor Judiciary Education Board.

**4.** These stipulations point up the distance between this case and the cases cited by our brother in his dissent. Unlike this case, in both of those cases racist remarks were made repeatedly and over long periods of time, and were made in the course of judicial proceedings. In the California case (*In re Stevens*, 31 Cal.3d 403, 183 Cal.Rptr. 48, 645 P.2d 99 (1982)) the court observed that "during his current term of office, and during the six years prior thereto, Judge Stevens repeatedly

and persistently used racial and ethnic epithets to counsel and court personnel . . . [such as] Jig, dark boy, colored boy, nigger, coon, Amos & Andy, and jungle bunny." In the Arizona case (*In re Goodfarb*, 179 Ariz. 400, 880 P.2d 620 (1994)) the court pointed out that "there was also substantial evidence . . . that many citizens have lost faith in Judge Goodfarb's judgment because he used racially inflammatory language in an official court proceeding and because of his chronic use of profanity in official proceedings."

sylvania, and Assistant Public Defender for Erie County, and

Fred Otis Rush, Jr., Affirmative Action Officer for Erie County, Executive Director of the Erie County Human Relations Committee, Director of the Governor's Committee on African–American Affairs and Chairman of the NAACP Legal Redress Committee.

Respondent also presented the testimony of Ian Murray, an attorney practicing in Erie County, who "spent [his] whole life fighting and working on issues that concern minorities in northwestern Pennsylvania," and who had represented hundreds of minorities before Respondent.

All of these witnesses testified that Respondent's impartial and evenhanded treatment of minorities who appear before him, as well as his conduct both on and off the bench, had earned him a reputation uncolored by any suggestion of racial bias. This reputation was earned over the course of Respondent's lifetime including over twenty years in the spotlight performing the duties of district justice. We think the testimony of Ian Murray is pertinently illustrative of the point and quote part of it:

Q. Are you an attorney?

A. Yes, I am.

Q. And are you presently practicing in the Commonwealth of Pennsylvania?

A. Yes. Solo practitioner, yes.

Q. And how many years have you been practicing?

A. Since '81.

Q. During that time have you gotten to know Peter Paul Nakoski as a district justice and as a person in the community?

A. Since 1971.

Q. And have you been involved with defending defendants that go to preliminary—

A. I think I probably represented more minority people than anyone in

Erie. Probably around 4,000 over that period of time.

Q. Do you know the reputation of District Justice Peter Paul Nakoski in the community with reference to whether he's prejudiced or biased against minorities or African–Americans?

A. Yes, I would know that.

Q. What is that reputation?

A. Being honest, being fair. I probably represented over 200 minority clients in his office. I was the chair of the Human Relations Commission. I was director for years. At various times I was chair of the Legal Redress Committee of the NAACP, the Education Committee of NAACP, the Legal Redress. I'm presently serving on the Board of the Hispanic Council of the city of Erie, of Erie County. I spent my whole life fighting and working on issues that concern minorities in Northwestern Pennsylvania.

I'll give you one example. One time I was representing a client up there, a black African–American. While I was in front of the judge, three of my witnesses for my client rifled my car, took everything out of my car.

You can imagine. I went out and found out my witnesses and my client had taken my car. I was outraged. I mean you probably could have had me in this front of this Board I was so hot.

I got in front of the judge. I'm, You know, Judge, those bastards, they took my stuff right out of my car. I swear to God I'm going to go up to that jail and I'm going to get my client.

In any event, the judge's reaction was, Ian, settle down. These things happen.

I mean any other person I know that has a proclivity for racial kinds of sentiment deep in their heart would

have been throwing it out. He didn't do anything. So certainly I'm in a position, as well as anyone, to know whether or not Peter Nakoski is an individual whose heart has any of that racist kind of expression. He's never showed it to me or any of my clients or anybody else that I know of.

This is not testimony of abstraction and generality; this is explicit, true-to-life and impelling. Our Supreme Court, in an opinion authored by Justice James McDermott, described the character of reputation evidence as follows:

"To offer evidence of an otherwise unblemished life is not a plea of mercy. It is, in fact, to be weighed against any present allegation to the contrary. Character evidence may give a name to damning combinations different than what they seem, and be the truth that sets one free."

See *Commonwealth v. Neely*, 522 Pa. 236, 239, 561 A.2d 1, 2 (1989).

Weighing this evidence together with the other evidence in this case in accordance with the enjoinder of the Supreme Court we conclude that the Board has not established by clear and convincing evidence that Respondent's conduct constituted a violation of Rule 2A of the Rules Governing Standards of Conduct of District Justices.

**COUNT 3.** Violation of Article V, § 17(b) of the Pennsylvania Constitution.

Article V, § 17(b) of the Pennsylvania Constitution provides:

Justices and judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court. Justices of the peace shall be governed by rules or canons which shall be prescribed by the Supreme Court.

As we have said before[5], violations of Article V, § 17(b) are derivative of other violations, and, since Respondent's conduct did not constitute an "activity prohibited by law" and since we have found no violation of Rule 1 or Rule 2A has been established, there has been no violation of Article V, § 17(b).

**COUNT 4.** Conduct which brings the judicial office into disrepute.

In *In re Smith*, 687 A.2d 1229 (Pa. Ct.Jud.Disc.1996), this Court noted that the conduct of a judge which results in a decline in the public esteem for that judge, may not support the conclusion that the conduct has brought the judiciary as a whole into disrepute, absent a persuasive showing by the Board that the conduct is so extreme as to have brought the judicial office itself into disrepute.

In *In re Cicchetti*, 697 A.2d 297, 312 (Pa.Ct.Jud.Disc.1997), this Court observed that:

The determination of whether particular conduct has brought the judicial office into disrepute, of necessity, is a determination which must be made on a case by case basis as the particular conduct in each case is scrutinized and weighed.

We hold that the Board has not established by clear and convincing evidence that the conduct of Respondent as examined earlier in our consideration of Count 2, is such that brings the judicial office into disrepute. We hold that the Respondent's extemporaneous response to the instructor's question given in a class attended exclusively by his fellow district justices is not such that brings the judicial office itself into disrepute. Nor do we believe that evidence that the response evoked a negative reaction from eight of the forty-eight present in the classroom serves to satisfy the Board's burden of establishing by clear and convincing evidence that the response brought the judicial office itself into disrepute.

---

5. See, e.g., *In re Strock*, 727 A.2d 653 (Pa.Ct. Jud.Disc.1998); *In re Terrick*, 712 A.2d 834 (Pa.Ct.Jud.Disc.1998); *In re Joyce*, 712 A.2d 834 (Pa.Ct.Jud.Disc.1998); *In re Walters*, 697 A.2d 320 (Pa.Ct.Jud.Disc.1997); and *In re Cicchetti*, 697 A.2d 297 (Pa.Ct.Jud.Disc.1997).

We conclude that the Board has failed to sustain its burden of establishing by clear and convincing evidence that the conduct of Respondent was such as to bring the judicial office into disrepute.

**COUNT 5.** Conduct which prejudices the proper administration of justice.

■ In *In re Smith,* 687 A.2d 1229 (Pa. Ct.Jud.Disc.1996) this Court made its initial examination of the compass of "conduct which prejudices the proper administration of justice" as used in Article V, § 18(d)(1) of the Pennsylvania Constitution. There, President Judge McCloskey, speaking for a unanimous court, concluded that:

> Conduct which prejudices the proper administration of justice contains three elements: (1) misconduct, (2) committed with the intent to obstruct proceedings, and (3) which obstructs the administration of justice.

*Id.,* at 1238.

In this case none of the facts relating to Respondent's conduct amount to any obstruction or interference with judicial proceedings. There has been no showing that Respondent's conduct was committed with the intent to obstruct proceedings or that it did obstruct the administration of justice. Moreover, in *In re Smith, supra,* this Court held that conduct prejudices the proper administration of justice only where there is a

> specific intent ... that the conduct would have a deleterious effect upon the administration of justice, for example, by effecting a specific outcome.

*Id.* See, also, *In re Cicchetti, supra,* at 312.

No specific intent to impose a deleterious effect on the administration of justice or to effect a specific outcome can be imputed to Respondent's remarks. Thus, the evidence in this case bears no resemblance to the type of conduct described in *Smith* as constituting that which prejudices the proper administration of justice, and, consequently, we find that the Board has failed to satisfy its constitutional bur-

den in establishing the charge set out in Count 5.

## IV. SUMMATION

The conclusion of this Court should not give the Respondent any satisfaction. The conclusions of law notwithstanding, this Court is deeply troubled by the Respondent's obvious lack of judgment in this matter. While not meeting the legal burden of proof for sanctions, the conduct in this matter clearly meets the common sense test for reproach by this Court. Members of the judiciary hold a unique status which should be maintained *at all times* by sound and temperate action. Action which motivates eight members of the judiciary to note conduct to the contrary is reprehensible and indicates a total lack of regard for the men and women who work daily to ensure the law's dignity and impartiality.

The Respondent would do well to strive for exemplary conduct rather than take any comfort in perceived vindication.

## V. CONCLUSIONS OF LAW

1. The Board did not establish by clear and convincing evidence that the Respondent's conduct constitutes a violation of Rule 1 of the Rules Governing Standards of Conduct of District Justices (Count 1).

2. The Board did not establish by clear and convincing evidence that the Respondent's conduct constitutes a violation of Rule 2A of the Rules Governing Standards of Conduct of District Justices (Count 2).

3. The Board did not establish by clear and convincing evidence that the Respondent's conduct constitutes a violation of Article V, § 17(b) of the Pennsylvania Constitution (Count 3).

4. The Board did not establish by clear and convincing evidence that the Respondent's conduct was such that brings the judicial office into disrepute (Count 4).

5. The Board did not establish by clear and convincing evidence that the Respon-

dent's conduct was such that prejudices the proper administration of justice (Count 5).

## ORDER

PER CURIAM.

AND NOW, this 19th day of October, 1999, based upon the Opinion filed herewith, it is hereby ORDERED:

That, pursuant to C.J.D.R.P. No. 503, the attached Opinion with Findings of Fact and Conclusions of Law be and it is hereby filed, and shall be served upon the Judicial Conduct Board and upon the Respondent,

That either party may elect to file written objections to the findings and conclusions of the Court, stating therein the basis for those objections, provided that such objections shall be filed with the Court within ten (10) days of the date of the entry of this Order, and a copy thereof served upon the opposing party,

That, in the event such objections are filed, the Court shall determine whether to entertain oral argument upon the objections, and issue an Order setting a date for such oral argument, and

That, in the event that timely objections are not filed within ten (10) days, or the Court decides that oral argument shall not be presented, this Court will issue an Order dismissing the Board's Complaint.

## ORDER

PER CURIAM.

AND NOW, this 2nd day of December, 1999, based upon the Findings of Fact and Conclusions of Law filed by this Court on October 19, 1999, it is hereby ORDERED that the Complaint against the Respondent is dismissed.

BYER, J., files a dissenting opinion.

BYER, Judge, dissenting..

At a continuing education course for district justices, the instructor demonstrated a point concerning the absence of probable cause by asking the rhetorical question, "[i]t's not unlawful or illegal to be a black man, is it?" Respondent, a member of the Pennsylvania judiciary, expressed disagreement with the instructor by answering the question, "yes," thus expressing that it is "unlawful or illegal to be a black man." (Majority Opinion: Findings of Fact: 5, 6). Respondent followed his statement by saying "[t]hey're all in jail. They're the ones doing all the robberies and burglaries." (Majority Opinion: Finding of Fact: 12).

There is no evidence that Respondent's tone of voice was facetious. Respondent did nothing to clarify his remarks or to let people know that he was engaging in sarcasm or making an attempt at satire. Instead, the uncontradicted evidence (which the Majority Opinion does not mention) is that Respondent, immediately after his offensive remarks, then turned to a district justice with a Hispanic surname who was identified as the "only minority" present (Tr. 27) and said, "no offense to you." (Tr. 26).

One of the district justices who attended the course reported the incident to the Judicial Conduct Board. The Board filed a disciplinary complaint against Respondent. The majority concludes that Respondent's conduct, while deserving criticism, did not violate the Rules Governing Standards of Conduct of District Justices. I dissent, because even if I assume that Respondent is not a racist, his public comments were of a racist nature which, if left unsanctioned, would undermine the public's expectation that members of the Pennsylvania judiciary administer equal justice, regardless of race. Thus, while I agree that Respondent's poor judgment and offensive conduct merits criticism, I would go further and find that Respondent has violated the Rules Governing Stan-

dards of Conduct of District Justices and warrants disciplinary sanction.

Specifically, I would hold that Respondent's racist statements constitute (1) a violation of Rule 2A of the Rules Governing Standards of Conduct of District Justices and (2) conduct which brings the judiciary into disrepute, under Art. V, § 18(d)(1) of the Constitution.

Judicial officers must at all times not only be concerned with maintaining actual impartiality, but also with the appearance of impartiality. Rule 2A, like Canon 2A of the Code of Judicial Conduct directs:

> A district justice shall respect and comply with the law and shall conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

Even if Respondent did not intend for his comments to express his true personal opinion, the nature and manner of his expression created a strong likelihood that others hearing his words would believe that he meant what he said. Upon hearing such words, those persons could reasonably believe that the Respondent could not perform his duties with impartiality. At the time he spoke those words, he said nothing to disabuse persons hearing them that he did not believe what he said. Disavowing the words only upon threat of discipline cannot erase the impact of the words, and, even if one assumes that his proffered explanation at trial is true—that he was seeking to engage in discussion of a political issue—his injudicious decision to initiate a discussion in a seemingly racist manner, without ever attempting to create a contrary impression, nevertheless constitutes a violation of the Rule.

Support for this conclusion can be found in other jurisdictions. In *In re Stevens*, 31 Cal.3d 403, 183 Cal.Rptr. 48, 645 P.2d 99 (1982), a judicial officer used racial epithets in presence of court personnel and in chambers. Despite testimony of his equitable and impartial performance of duties, and evidence of lack of actual bias, the court agreed with the conclusions of the California Commission on Judicial Performance that the conduct was so prejudicial to the administration of justice as to bring the judicial office into disrepute.

In *In re Goodfarb*, 179 Ariz. 400, 880 P.2d 620 (1994), a judge used an obscene racist expression allegedly in jest in his chambers in the presence of counsel during a pre-hearing discussion. The Commission on Judicial Conduct considered various mitigating and aggravating factors. As a mitigating factor, "the Commission found that Judge Goodfarb's use of racist and profane language was just that, and did not interfere with his ability to fairly decide cases." 179 Ariz. at 401, 880 P.2d at 621. The Commission held the use of racial epithets, even when allegedly "in jest," to constitute violations of Canons 1, 2A, and 3A, and conduct so prejudicial to the administration of justice as to bring the judicial office into disrepute. 179 Ariz. at 401–2, 880 P.2d at 621–2. On appeal, the Supreme Court of Arizona noted that "[t]his case does not involve a judge's private life. This misconduct occurred in the course of official judicial proceedings. A judge must be able to distinguish between the two, and a consistent inability to do so raises profound questions about the judge's judgment." 179 Ariz. at 403, 880 P.2d at 623.

Even if he did not mean to do so, Respondent's racist statements, uttered in public at an official function, created the unmistakable impression that this judicial officer harbored a bias against African–Americans who might appear before him.

This is sufficient to find a violation of Rule 2A. The Board has no burden to establish the absence of possible explanations or excuses for the statements in order to carry its burden of proof. The Board needed only to prove that the judicial officer made remarks that create an appearance of partiality. The words the Respondent used clearly create the impression that the speaker is of the opinion that only African–Americans commit cer-

tain crimes. Such conduct by judicial officers cannot be tolerated even if motivated by poor judgment rather than actual bias, because the effect on public perception is the same.

I also would hold that the Board has sustained its burden of proving that Respondent's racist conduct is of a nature which brings the judiciary into disrepute, for purposes of Pa. Const. Art. V, § 18(d)(1). In *In re Smith*, 687 A.2d 1229 (Pa.Ct.Jud.Disc.1996), we held that the Board must "make a persuasive showing that (1) the judicial officer has engaged in conduct which is so extreme that (2) it has resulted in bringing the judicial office into disrepute." *Id.* at 1238. As noted in *In re Cicchetti*, 697 A.2d 297, 312 (Pa.Ct.Jud. Disc.1997), the question of whether certain conduct constitutes a violation of this provision must be determined on a case-by-case basis.

I conclude that Respondent's statement was not only sufficient to bring his own reputation into disrepute, but also so egregious as to bring the judiciary as a whole into disrepute. *Smith, supra*, at 1239. The public, upon hearing that a member of the judiciary had made such racist statements, might believe that such opinions are not isolated among members of the judiciary. Respondent's conduct has placed a pall over other judicial officers and the system as a whole, drawing in question the judiciary's impartiality towards African–Americans.

In *Reitmeyer v. Unemployment Compensation Board of Review*, 145 Pa. Commw. 177, 602 A.2d 505 (1992) (Byer, J.), the Commonwealth Court held that a teacher who circulated solely to other faculty members two copies of a so-called "joke sheet" which contained items of a racist nature had committed willful misconduct requiring the denial of unemployment benefits. In so holding, the Commonwealth Court rejected the teacher's defense that he was unaware of the racist nature of some of the alleged "jokes," because he had read only the first two or three before distributing two copies of the "joke sheet." Even assuming that to be the case, the Commonwealth Court held that the act of a teacher in distributing the racist "joke sheet" to other faculty members in a public school "was a horrible example for his students" and fell short of the school district's justifiable expectation that its teachers would "conduct themselves in such a way as to command the respect and goodwill of the community." *Id.* at 181, 602 A.2d at 507. Similarly, Respondent's conduct in this case falls short of the justifiable expectation of the public that members of the judiciary will not act in any manner which appears to be inconsistent with the requirement that justice be free of racial bias.

In *Reitmeyer*, I wrote for the court, "[r]acism is an evil which a decent society cannot tolerate." *Id.* at 182, 602 A.2d at 508. Because a decent society should not tolerate even the appearance of racism on the part of a judicial officer, I respectfully dissent.