**In re Allan Clifford BERKHIMER Magisterial District Judge In and For Magisterial District 47–3–06 Cambria County.**

No. 4 JD 04.

Court of Judicial Discipline of Pennsylvania.

April 14, 2005.

Before: DEBBIE O'DELL SENECA, P.J., JOSEPH A. HALESEY, ROBERT L. CAPOFERRI, PAUL P. PANEPINTO, LAWRENCE J. O'TOOLE, WILLIAM H. LAMB and MARC SANDLER, JJ.

PANEPINTO, Judge.

## I. *INTRODUCTION*

The Judicial Conduct Board (Board) filed a Complaint with this Court on June 15, 2004 against Magisterial District Judge Allan Clifford Berkhimer (Respondent) consisting of four counts which charge Respondent with a total of six violations as follows:

1. Misconduct in office, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution (Count 1),

2. Conduct which prejudices the proper administration of justice, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution (Count 1),

3. Conduct which brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution (Count 1),

4. Failing to conduct himself at all times in a manner promoting public confidence in the integrity of the judiciary, a violation of Rule 2A. of the Rules Governing Standards of Conduct of District Justices (Count 2),

5. Failing to be patient, dignified, and courteous to members of his staff subject to his direction and control, a violation of Rule 4C. of the Rules Governing Standards of Conduct of District Justices (Count 3), and

6. Using the premises established for the disposition of his magisterial business for other gainful pursuit, a violation of Rule 3B. of the Rules Governing Standards of Conduct of District Justices (Count 4).

The Board has presented its case in two parts: the first part (PART A herein) is styled "Indecorous Language and Behavior Unbecoming a Judicial Officer" and arises from the complaints of members of Respondent's office staff that Respondent routinely used improper and offensive language in his office in dealing with his staff and others and include a number of specific instances. These charges are set out in numbers 1–5 above, and Counts 1, 2 and 3 relate to that conduct. The second part of the Board's Complaint (PART B herein) is styled "Improper Use of County Employees, Equipment and Funds" and arises from Respondent's practice of having his employees send congratulatory notes by mail to constituents who were mentioned in the local newspaper for some particular accomplishment or other. These postal messages were called "Quickie Notes" by Respondent and his staff. These charges are set out in number 6 above, and are the subject of Count 4.

A trial was conducted on December 14, 15 and 16, 2004 at which time testimony was taken. The parties furnished the Court with stipulations as to some facts which are part of the record in this case.

## II. FINDINGS OF FACT

1. The Board is empowered by Article V, § 18 of the Constitution of the Commonwealth of Pennsylvania to file formal charges alleging ethical misconduct on the part of judges, justices, or justices of the peace[1] and to present the case in support of the formal charges before the Court of Judicial Discipline.

2. Allan Clifford Berkhimer (hereinafter referred to as "Respondent"), serves as Magisterial District Judge of Magisterial District 47–3–06, located in Cambria County, a part of the Forty–Seventh Judicial District of Pennsylvania, encompassing the Townships of Adams, Conemaugh and Croyle and the Boroughs of Ehrenfield, South Fork and Summerhill.

3. The Respondent has served continuously as Magisterial District Judge for Magisterial District 47–3–06, since January 4, 1988.

4. Karen Roberts has been employed in Respondent's office as clerk supervisor since 1991. She continues in that employment. Diane Weaver was employed as a clerk by Respondent from February 2000 to the end of October 2004. Daphne Moot was employed as a clerk by Respondent from August 26, 2002 to June 20, 2003.

## A. PART A.

5. On or about August 1, 2002, Daphne Moot, submitted a written application for the position of clerk in the Respondent's magisterial district office.

6. After submitting her written application, Moot reported to the Respondent's office for a job interview. During the interview, the Respondent stated words to Moot to the effect: "I am not a political whore. I don't kiss anybody's ass unless pussy's involved."

7. Karen Roberts was present during this interview.

8. Sometime after the initial interview, the Respondent telephoned Moot at her

---

1. "Justices of the Peace" have been more recently known as "District Justices" and are now known as "Magisterial District Judges."

See Pennsylvania Supreme Court Order dated January 6, 2005, effective January 29, 2005.

home and requested that she come to his office for a second conversation.

9. During the second interview, at which no one else was present, the subject of motorcycles came up, and Respondent told Moot that "he likes it when girls ride motorcycles with him because their legs are spread and it's like foreplay."

10. During the same interview Respondent also told Moot that "he didn't like to wear a helmet [when riding a motorcycle] because it was just like him having sex, he doesn't use protection for sex either."

11. Daphne Moot was married and had two minor children. Her husband had recently lost his job and she accepted the Respondent's offer for employment and commenced her duties as a clerk in his magisterial office on or about Monday, August 26, 2002.

12. Some time during Moot's employment, Respondent related a story he said he had heard from some local police officer who said he had heard it from a U.S. Army officer recently returned from Afghanistan.

The story which Respondent related to Moot, Weaver and Roberts, included the following: "Do you know what they do to Afghanistan boys when they join the Army when they're 12? They bend them over the barrel and fuck them up the ass."

13. The Respondent had in his office a computer provided by the Administrative Office of Pennsylvania Courts and a personal (Compaq) computer which he had brought from his residence. On approximately five (5) occasions the Respondent would summon his female staff back to his office without explanation and state words to the effect: "Come here and look at this."

14. On those occasions the Respondent would show pictures of naked adult females to his female staff.

15. Daphne Moot described these pictures as being of "naked females."

16. Karen Roberts described these pictures as "real fat ladies in bathing suits, fat was hanging out all over the place."

17. Diane Weaver described one particular photograph depicting "a lady's rear end took up the whole screen, and in the middle, in the crack was like a sandwich; and another photograph of a lady sitting in a tub ... her breasts were hanging and she had this long straggly looking hair."

18. On these occasions, Daphne Moot and Diane Weaver reacted with disgust, and repeatedly refused to respond to the Respondent's invitations to look at any other such pictures. These pictures upset and embarrassed Daphne Moot and Diane Weaver. Karen Roberts described the pictures as "gross" and "not something I like to look at."

19. In approximately March or April 2003, upon returning from a luncheon at a local school attended by various members of the community, the Respondent told Diane Weaver words to the effect: "I saw your friend (Pennsylvania State Police Officer Barto). I told him what you told me to tell him. I told him that when I mention his name to you, you get wet."

20. This remark, which was made in the presence of Moot and Roberts, in addition to Weaver, caused Weaver to be very embarrassed.

21. Sometime while Moot was employed in Respondent's office, a case named *Commonwealth v. Lewis* came before Respondent for preliminary hearing. This was a child pornography case and the prosecuting officers had downloaded hundreds of photographs from the defendant's computer to a laptop which they brought to Respondent's courtroom and placed on the bench.

22. Lewis waived the hearing, after which the prosecuting officer showed Respondent four or five of the photographs. One of the photographs was of a female child of about five to eight years of age, facing the camera straddling an erect penis.

23. Despite Moot's protestations, Respondent graphically described the photograph to his staff members, Moot, Roberts and Weaver.

24. On one occasion Respondent came into the secretarial section of his court and shared with his female staff the details of an escapade he had recently had with some unidentified woman, i.e., that "they were hot and heavy into it and she ripped the skin off his back with her fingernails."

25. Respondent routinely, regularly, frequently, often, used crude, coarse, vulgar, offensive and improper language, including frequent use of the F-word, in conversing with his female staff and others in the course of an ordinary day at the office.

## B. PART B.

26. Respondent had instituted a practice in his office whereby his office staff would review the local weekly newspaper to discover if any of Respondent's constituents were mentioned for some achievement or other and then, if they were, his staff would prepare a "Quickie Note" for Respondent congratulating the constituent for his or her success. These "Quickie Notes" were sent by U.S. Mail and contained a photograph of Respondent in his robe and the address of his court. Exhibit B–2 is a prototype of a "Quickie Note."

## III. DISCUSSION

### A. INTRODUCTORY

. The constitutional amendment of 1993 establishing this Court provided certain specific instructions for the conduct of proceedings before this Court:

All hearings conducted by the court shall be public proceedings conducted pursuant to the rules adopted by the court and in accordance with the principles of due process and the law of evidence. Parties appearing before the court shall have a right to discovery pursuant to the rules adopted by the court and shall have the right to subpoena witnesses and to compel the production of documents, books, accounts and other records as relevant. The subject of the charges shall be presumed innocent in any proceeding before the court, and the board shall have the burden of proving the charges by clear and convincing evidence.

Pa. Const. Art. V, § 18(b)(5).

The Pennsylvania Supreme Court has defined clear and convincing evidence as follows:

The witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue .... It is not necessary that the evidence be uncontradicted ... provided it "carries conviction to the mind" or carries "a clear conviction of its truth."

In re Adoption of J.J., 511 Pa. 590, 595, 515 A.2d 883, 886 (1986). See, also, La Rocca's Trust, 411 Pa. 633, 640, 192 A.2d 409, 413 (1963).

Acting under the provisions of C.J.D.R.P. No. 501, the President Judge appointed a Panel to conduct the trial of this case. The Panel, consisting of Conference Judge Panepinto; Judge O'Toole and

President Judge O'Dell Seneca, conducted the trial December 14–16, 2004. Findings of Fact were initially made by the Panel.

■ Since the Constitution requires that "all actions of the court ... shall require approval by a majority vote of the members of the court" the Panel's Findings of Fact have been reviewed and this Decision is rendered by the full Court. As we noted in *In re Nakoski*, 742 A.2d 260, 263 (Pa.Ct.Jud.Disc.1999) and *In re Manning*, 711 A.2d 1113, 1117 (Pa.Ct.Jud.Disc. 1998), this Court is constrained to accord special deference to the findings of a Panel for, as the ones who hear the witnesses testify and observe their demeanor, it is they who are best positioned to assess credibility.

The Supreme Court of Pennsylvania has addressed this subject as follows:

As long as sufficient evidence exists in the record which is adequate to support the finding found by the trial court, as factfinder, we are precluded from overturning that finding and must affirm, thereby paying the proper deference due to the factfinder who heard the witnesses testify and was in the sole position to observe the demeanor of the witnesses and assess their credibility. This rule of law is well established in our jurisprudence and is rooted in concepts of fairness, common sense and judicial economy. (citations omitted)

*Commonwealth Dept. of Transportation v. O'Connell,* 521 Pa. 242, 248, 555 A.2d 873, 875 (1989). See, also, the observations of the United States Supreme Court in *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), "the determination is essentially one of credibility, and therefore largely one of demeanor. As we have said on numerous occasions, the trial court's resolution of such questions is entitled ... to 'special deference'", and in *Bose Corp. v. Consumers Union of U.S.,* *Inc.,* 466 U.S. 485, 500, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). "The requirement that special deference be given to a trial judge's credibility determinations is itself a recognition of the broader proposition that the presumption of correctness that attaches to factual findings is stronger in some cases than in others."

In this case, at least with respect to some of the charges in PART A, credibility of those who testified is central inasmuch as some of the allegations are flatly denied by Respondent; others have been cast by Respondent as a question of degree. Some are admitted and we have stipulations regarding them. With respect to PART B, the facts regarding the purpose and preparation of the "Quickie Notes" are largely undisputed.

## B. DISCUSSION OF FINDINGS OF FACT

### 1. PART A.

The Board has charged that the conduct of Respondent set out in PART A of the Complaint (paragraphs 1–19) constitutes:

1. misconduct in office (Count 1),

2. conduct which prejudices the proper administration of justice (Count 1),

3. conduct which brings the judicial office into disrepute (Count 1),

4. failure to conduct himself at all times in a manner promoting public confidence in the integrity of the judiciary (Count 2), and

5. failure to be patient, dignified, and courteous to members of his staff subject to his direction and control (Count 3).

In PART A, the Board makes the general allegation that it was Respondent's routine practice to use crude, vulgar language in speaking with his staff and others in the course of an ordinary workday.

Also, in PART A, the Board makes allegations of eight specific instances of inappropriate offensive language and conduct.[2] Inasmuch as most of these allegations are denied by Respondent, or their effect minimized, it will be necessary to make findings as to each. In each case, determinations of credibility will be important.

Though we deal with these matters separately, determinations as to the specific will bear on determination of the general, and the other way round.

We will first discuss our factual findings respecting the eight specific and one general allegation in PART A and then determine whether they constitute the five violations charged.

The eight charges of specific instances of improper language or conduct include:

1. Diane Moot's initial interview,

2. & 3. Diane Moot's second interview,

4. the Afghan Army story,

5. the "get wet" episode,

6. the naked women on the computer charge,

7. the child pornography case,

8. the description of sexual escapades charge.

We will begin with instance number 5.

■ On the day in question, Respondent attended a luncheon at which a State Police Officer, by the name of Steve Barto, was also present.

*Diane Weaver testified:*

A. He came back from the school and he was standing there signing citations at the counter. And Daphne asked him who was present at this luncheon program.

Q. Daphne Moot?

A. Yes.

Q. Okay.

A. And he was naming some of the officers, and he said, Diane, your friend was there. And I said, oh, who, Dan Dunn. He said no, your other friend. And I said who's that, he said Steve Barto. I said, oh, did you tell him I said hi. He said no, I told him what you told me to tell him next time I saw him. And I said, what was that? He said, I told him every time I mentioned his name to you, you would get wet.

Q. How did you react to that statement?

A. I was very embarrassed.

Q. You said that your fellow workers, Daphne Moot and Karen Roberts were there?

A. Yes.[3]

*Daphne Moot testified:*

Q. Do you recall an incident regarding a Pennsylvania state police officer by the name of Barto and a comment being made from Justice Berkhimer to Diane Weaver?

A. I do remember that comment.

Q. Would you, first of all, state the comment you heard and where was it made?

A. The comment was made in the office, and the comment was, his words were, I told him that she gets wet when you hear his name.[4]

---

2. There are ten instances mentioned in the Complaint, however, as. to two of them—the incident involving Diane Weaver's daughter, and the incident in the Pizza Man restaurant—we are not satisfied that the Board has established that they occurred as alleged by clear and convincing evidence.

3. N.T. 92–93.

4. N.T. 32–33.

*Karen Roberts testified:*

Q. Do you recall an incident regarding Trooper Barto's name being mentioned and a comment made by District Justice Berkhimer to Diane Weaver in this regard?

A. Yes.

Q. Please relate what you heard?

A. The actual comment?

Q. Yes.

A. I can't give it word for word. It was something about every time you mention his name you get wet, your pants get wet or something to that effect.[5]

Respondent admits this occurred and stipulated to it. See Stipulation No. 10, Findings of Fact Nos. 19 and 20.

Of this we will say, first of all, that it is hard to imagine a remark that could be more boldly disrespectful or more pointedly designed to embarrass, and, secondly, that anyone capable of calling up the indecency to make such a remark is capable of making any and all of the other remarks ascribed to him in the charges of the Board.

Next, we discuss our finding that Respondent routinely, regularly, frequently, often, used crude, coarse, vulgar, offensive and improper language, including frequent use of the F-word, in conversing with his female staff and others in the course of an ordinary day at the office.

*Daphne Moot testified:*

Q. Mrs. Moot, I believe you stated that one of the reasons that you quit your position was because of the Respondent's vulgarity?

A. That's correct.

Q. Would you explain what you meant by that, why that was one of your reasons for quitting.

A. The F-word was used very, very frequently in the office, almost every sentence, every other sentence, by Allan. You know, the stories that he would tell us using vulgarity, sexual connotations, that's the vulgarity I was talking about.

Q. Was that a routine course of conduct?

A. Yes.

Q. You're saying daily?

A. Yes, it was daily.

*Diane Weaver testified:*

Q. Mrs. Weaver, did Judge Berkhimer use the F-word?

A. Yes.

Q. We're not mistaken about what we're referring to, F-u-c-k?

A. (Witness nodded head.)

Q. Did he use it rarely, on occasion, constantly?

. . . .

Q. Did he use the F-word?

A. Yes.

Q. Under what circumstances and when?

A. Frequently. Every day.

Q. Every day?

A. Uh-huh. It was part of his vocabulary.

Q. Did you hear that?

A. Yes.

Q. Did others hear it?

A. Yes.

Q. Was it in the presence of staff, yourself and others?

A. Yes.

*Karen Roberts testified:*

Q. Mrs. Roberts, do you still have the transcript of your deposition?

5. N.T. 197.

A. No. I just have these two.

Q. This?

A. Yes.

Q. I'm going to show you page 32, line 7, my question to you relative to the F-word, is that not a common part of Judge Berkhimer's vocabulary, what is your answer on line 9?

A. I say yes, he does use it.

Q. Question, does he use that word with regularity. Your answer?

A. What do you consider regularity?

Q. My question, often. Your answer?

A. Often, yes.

Karen didn't want to say Respondent used the F-word "with regularity"—and wouldn't; but she said "often." That made it unanimous.

A word about Karen Roberts. She has worked for Respondent since 1991 and still does; she was obviously loyal to Respondent and said so.[6] She was obviously very reluctant to testify in this case,[7] i.e., she was very reluctant to give testimony damaging to Respondent; to this end she sidestepped, evaded, minimized; but she was not willing to lie. When the only alternative was to lie, she told the truth. She gave ground grudgingly, but give ground she did. If Karen Roberts testified Respondent said or did something hurtful to his side of the case, we have no doubt he said it and did it.

Nor does Respondent's testimony in any way dilute our conviction. Essentially, he does not deny his use of coarse and profane language,[8] including the F-word[9] in his office: he said he used profanity "from time to time" but only "in a private setting"[10] or in "private conversation."[11] He admitted that he had warned Daphne Moot that she was going to hear "coarse and profane language, including from [him]."[12] He admitted to the Cambria County Director of Personnel that "[he had] used profane language" in the office.[13] When asked if Daphne Moot and Diane Weaver had lied to the Court when they "testified under oath that [he] used the F-word as an adjective for just about every other sentence or as a common part of [his] vocabulary," he said "they exaggerated."[14]

We have no hesitancy in finding that the Board has established by clear and convincing evidence that Respondent routinely, regularly, frequently, often, used crude, coarse, vulgar, offensive and improper language, including frequent use of the F-word, in conversing with his female staff and others in the course of an ordinary day at the office.

We now address instances 1, 2 and 3 which took place at Daphne Moot's two job interviews.

1. Daphne Moot's initial interview.

2. & 3. Daphne Moot's second interview.

We will discuss these three allegations together because they occurred close in time but mainly because Daphne Moot's credibility is crucial in all three.

1. In the initial interview Daphne Moot testified Respondent told her "he was not a political whore, and that he doesn't

6. N.T. 194.

7. N.T. 232.

8. N.T. 429.

9. N.T. 393.

10. N.T. 391.

11. N.T. 393.

12. N.T. 429.

13. N.T. 168, 428–29.

14. N.T. 434.

kiss anyone's ass unless pussy's involved." We find that Respondent did say exactly that. Several things lead us to that finding:

(a) Respondent admitted he said "I'm not a political whore," so there is no dispute that the conversation did take place.

(b) Karen Roberts was present and corroborated Moot: she said that Respondent did say exactly what Moot said he said.[15]

(c) We believe Daphne Moot told the truth when she said Respondent said "I don't kiss anyone's ass unless pussy's involved."

2. & 3. We also believe Daphne Moot told the truth when she testified that, at the second interview Respondent said: "I like it when girls ride motorcycles with me because their legs are spread and it's like foreplay" and "I don't like to wear helmets because it was just like him having sex, he doesn't use protection for sex either."

We believe this testimony of Daphne Moot was truthful for several reasons.

1. To find otherwise would require a finding that Daphne Moot made a studied decision to "make up" these outlandish scenarios and to fill them with the stunningly graceless, gratuitous remarks attributed to Respondent. Such a finding we are unable to make.

2. We were impressed with Daphne Moot and believe that she was an entirely credible witness.[16]

3. Based on the accumulated testimony in this case including that of the Respondent, and that, e.g., relating to the "get wet" episode, we find Respondent's fingerprints all over the "motorcycle remarks" of instances 2 and 3 which are set out in Findings of Fact Nos. 9 and 10.

Again, we find that the Board has established by clear and convincing evidence that Respondent said what Daphne Moot testified he said at the two interviews.

With respect to the remaining instances, 4, 6, 7 and 8 we find that the Board has established Moot and Weaver testified truthfully and that the events occurred as related by them and that the evidence is clear and convincing. We so find for all of the reasons set forth earlier in this opinion but for the following additional reasons:

As to instances 4 (the Afghan Army story), 6 (the naked women on the computer charge), and 7 (the child pornography case), there is no question that the events occurred: the only disputes are in the details.

As to the Afghan Army story, all agreed the story was told as Moot and Weaver testified, the only difference was in the specific language used: Moot and Weaver testified the boys were "fuck[ed] up the ass"; Respondent's version was that he said they were "sodomized"; Roberts said she couldn't recall the specific language he used.

We have no difficulty accepting Moot and Weaver's version and great difficulty accepting Respondent's. Moot and Weaver have no reason to "make up" this testi-

---

15. See discussion of Karen Roberts and her testimony, *supra.*

16. We also found Diane Weaver and Karen Roberts to be truthful witnesses. There is consensus on this point for the Respondent testified: "Q. Do you recall during your deposition, sir, advising or testifying under oath that your staff members and you named them at that time, Daphne Moot, Diane Weaver, Karen Roberts, were good employees? A. Yes. Q. That they were trustworthy employees? A. Yes. Q. And they were truthful employees? A. Yes." N.T. 437.

mony—at least none that has been demonstrated to this Court—and Respondent has every reason to deny it. Roberts, though she did not openly corroborate Moot and Weaver, wouldn't corroborate Respondent either—which she could have, for she certainly was offered the opportunity. But that would have been lying; so she didn't.

As to the naked women on the computer charge, all agree, including Roberts and Respondent, that Respondent did frequently call his office staff to come into his office to look at pictures on his personal computer. Again, the only dispute is in the detail of what images the ladies were called upon to view.

There is a curious element in this dispute. Respondent apparently believes that exhibiting "gross pictures" such as "real fat ladies in bathing suits [with] fat hanging out all over the place"[17]—so long as no genitalia or sexual activity is depicted—is perfectly acceptable behavior for a judge, even if his captive audience is his female employees, and even if those employees found the pictures "unpleasant," "gross," "disgust[ing]," and "embarrassing." We, rather, think that not to be the case.

In any event, we are convinced that the Board has established by clear and convincing evidence that Respondent exhibited not only the pictures he and Roberts described but also the ones described by Moot and Weaver set out in Findings of Fact Nos. 15, 16 and 17.

Referring now to instance 7, the only dispute is whether, on the morning the child pornography case was listed in Respondent's court, Respondent, despite Daphne Moot's protestations, graphically described one of the photographs which had been shown to him and others who were present by one of the prosecuting officers.

Once again we have no difficulty resolving this dispute because there really is no dispute at all.

Moot, who did not see the photo in question, testified that Respondent said "there was a little girl in these pictures and there was a penis between her legs." This description exactly matches the descriptions of one of the photos given by the Assistant District Attorney, the Public Defender and the prosecuting officer all of whom had viewed it. Moot's ability to do that, without ever having seen the picture herself, strongly persuades us that that is how she heard Respondent describe it. Moreover, explaining that he had found the photograph so disgusting that he didn't want his staff to see it, Respondent admitted that "[he] nonetheless described it graphically to his staff members."[18]

Finally, with respect to instance 8, for the reasons set forth above, we find that the Board has established by clear and convincing evidence that Daphne Moot testified truthfully that Respondent described to his staff details of a sexual escapade as set out in Finding of Fact No. 24.

## 2. PART B.

In PART B the Board charges that Respondent's use of his magisterial office employees, equipment and funds to send the "Quickie Notes" described *supra*, constituted a violation of Rule 3B. of the Rules Governing Standards of Conduct of District Justices (Count 4).

17. See Roberts testimony, N.T. 214. Respondent admitted that he exhibited a picture "of a grossly obese woman in a bathing suit." N.T. 374.

18. N.T. 431.

We find that the Board has not established by clear and convincing evidence that Respondent used county equipment or funds in the preparation and mailing of "Quickie Notes"; however, there is no doubt that Respondent did use his magisterial office and employees in the preparation and mailing of the "Quickie Notes," nor is there any doubt that their purpose was to get him votes. The question is whether that enterprise amounts to a violation of Rule 3B.

## C. *DISCUSSION OF CONCLUSIONS OF LAW*

### 1. PART A.

The Board has charged that the indecorous language and behavior set out in PART A of the Complaint constitute:

(a) misconduct in office (Count 1),

(b) conduct which prejudices the proper administration of justice (Count 1),

(c) conduct which brings the judicial office into disrepute (Count 1),

(d) failure to conduct himself at all times in a manner promoting public confidence in the integrity of the judiciary (Count 2),

(e) failure to be patient, dignified and courteous to members of his staff subject to his direction and control (Count 3).

We will address the five charges made in Counts 1—3 in the order in which the Board has placed them in the Complaint.

(a) *Misconduct in office (Count 1).*

The Pennsylvania Constitution provides:

A justice, judge or justice of the peace may be suspended, removed from office or otherwise disciplined for … *misconduct in office* ….

Pa. Const. Art. V, § 18(d)(1) (emphasis added).

■ We hold that Respondent's conduct described in PART A does not constitute the misconduct in office proscribed by the Constitution. Several decisions of this Court demand such a holding and it would suffice to simply cite them. However, in the interest of judicial expedition in future cases, we set out here, for easy reference, that portion of our opinion in *In re Cicchetti,* 697 A.2d 297, 310–11 (Pa.Ct.Jud. Disc.1997) on the point:

The Constitution does not, however, undertake to define "misconduct in office" so we look elsewhere for guidance. This Court, in the case of *In re Hasay,* 666 A.2d 795 (Pa.Ct.Jud.Disc.1995), *aff'd in part, rev'd in part* 546 Pa. 481, 686 A.2d 809 (1996), had occasion to address charges of "misconduct in office" and relied upon the definition of the common law crime of misconduct in office pronounced by our Superior Court in *Commonwealth v. Green,* 205 Pa.Super. 539, 546, 211 A.2d 5, 9 (1965):

The common law crime of misconduct in office, variously called misbehavior, misfeasance or misdemeanor in office, means either the breach of a positive statutory duty or the performance by a public official of a discretionary act with an improper or corrupt motive.

This Court, in *In re Timbers,* 668 A.2d 304 (Pa.Ct.Jud.Disc.1995), again considered the charge of "misconduct in office" but declined to adopt a specific definition of the offense. We now adopt the definition in *Commonwealth v. Green* with some clarification as follows:

Misconduct in office means the breach, by a judicial officer of a positive statutory duty or the performance by a judicial officer of a discretionary act in the course of official action with an improper or corrupt motive.

This definition clarifies, but does not change, the *Green* definition. The defi-

nition we here adopt addresses two types of action by a judicial officer—indeed the only types of action he can take—discretionary and non-discretionary. "Breach of a positive statutory duty" is a failure to perform a non-discretionary act—all other acts by a public officer are discretionary and, in either case, in order to constitute "misconduct in office" the acts must be performed in the course of the official duties of the office.

We believe this to be the clear intendment of the Superior Court as well as other courts which have had occasion to address the question. For example, in *Clark v. Weeks*, 414 F.Supp. 703 (N.D.Ill.1976), a county treasurer sought to enjoin his removal from that office under an Illinois statute which made "misconduct in office" grounds for removal, arguing that the term was unconstitutionally vague. The United States District Court held that it was not impermissibly vague because the misconduct referred to in the statute was "misconduct in office" and must be related to the performance of official duties—as contrasted with "misconduct" in general which would be (and has been held to be) too vague. The District Court there stated:

> The case law is clear that "misconduct in office" and its equivalent term "official misconduct", to warrant removal from office,
>
> "... must have direct relation to and be connected with the performance of official duties and amount either to maladministration or to a willful and intentional neglect and failure to discharge the duties of the office at all. It does not include acts and conduct which, though amounting to a violation of the criminal laws of the state, have no connection with the discharge of official duties. The misconduct which

will warrant removal of an officer must be such as affects his performance of his duties as an officer and not only such as affects his character as a private individual. In such cases it is necessary to separate the character of the man from the character of the office. The misconduct charged and established must be something which plaintiff did, or did not do, in his official capacity." [Quoting from the opinion of the Supreme Court of Michigan in *Wilson v. Council of City of Highland Park*, 284 Mich. 96, 278 N.W. 778 (1938).]

*Id.* at 707–708. The District Court then observed that:

> This definition of "misconduct in office" to include only wrongful acts or wrongful failures to act in the performance of the duties of office has been consistently accepted by the courts. [Citing cases from Louisiana, California and New Jersey as well as the decision of the Pennsylvania Superior Court in *Commonwealth v. Green, supra.*]

*Id.* at 708. Finally, the District Court emphasized the difficulties which would result if the meaning of the term is not so limited.

> Thus, the meaning of "misconduct in office" is substantially more specific than the meaning of the general term "misconduct" which has been found too vague to be a constitutional basis for imposing punishment ... [Citing the United States Supreme Court in *Giaccio v. Pennsylvania*, 382 U.S. 399, 404, 86 S.Ct. 518, [521–22], 15 L.Ed.2d 447 (1966) and *Soglin v. Kauffman*, 418 F.2d 163 (7th Cir. 1969)].

In all of these cases, the scope of the term "misconduct" was totally uncon-

fined, and punishment could have been imposed under the statutes and regulations found overly vague for any imaginable sort of human behavior, "so long as the objectionable behavior could be called misconduct at some later date." *Soglin, supra,* at 167. Considering the broad divergences of opinion in our pluralistic society over what constitutes proper behavior and what constitutes misconduct in many areas of behavior, there is no doubt that the unqualified term "misconduct" is a standard of conduct "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application ..." *Connally v. General Construction Co., supra,* 269 U.S. [385] at 391, 46 S.Ct. [126] at 127, [70 L.Ed. 322 (1926)].

As we held in *Cicchetti* we hold here that:

> Since Respondent's conduct can in no way be construed as relating to his performance or nonperformance of a discretionary or non-discretionary act in the course of his official duties, the charge of misconduct in office has not been established.

(b) *Conduct which prejudices the proper administration of justice (Count 1).*

■ As we said in *In re Cicchetti, supra,*

> Conduct which prejudices the proper administration of justice consists of (1) misconduct, (2) committed with the intent to obstruct judicial proceedings, and (3) which obstructs the administration of justice. In this case none of the facts relating to respondent's conduct as it related to Heather Brueggman amounted to any obstruction of or interference with judicial proceedings. Moreover, in *In re Smith,* 687 A.2d 1229, 1237–38 (Pa.Ct.Jud.Disc.

1996), we held that conduct prejudices the proper administration of justice only where there is a "specific intent ... that the conduct would have a deleterious effect upon the administration of justice, for example, by affecting a specific outcome."

*Id.* at 312. *See, also, In re Nakoski,* 742 A.2d 260, 269 (Pa.Ct.Jud.Disc.1999); *In re Trkula,* 699 A.2d 3, 8 (Pa.Ct.Jud.Disc. 1997); *In re Walters,* 697 A.2d 320, 322 (Pa.Ct.Jud.Disc.1997).

Since nothing in this record establishes these elements, we hold that Respondent's conduct did not prejudice the proper administration of justice.

(c) *Conduct which brings the judicial office into disrepute (Count 1).*

■ This Court has, on other occasions, determined whether various conduct was such that brought the judicial office into disrepute. We look, particularly, to our opinion in *In re Cicchetti, supra,* where a judge was charged with sexual harassment of a courthouse employee. There we found that that conduct was such that brought the judicial office into disrepute; in doing so we stated, quoting *In re Smith,* 687 A.2d 1229 (Pa.Ct.Jud. Disc.1996):

> (1) It cannot be *presumed* that a violation of any other provision, constitutional, canonical or criminal *automatically* lowers public acceptance of the authority of the judicial office. *Id.* at p. 1238; and
>
> (2) "Disrepute" necessarily incorporates some standard with regard to the reasonable expectations of the public of a judicial officer's conduct. Even if a judicial officer's conduct could reasonably result in the lessening of respect for that judge, it cannot be *assumed* that the same actions would necessarily bring the judicial office into disrepute. *Id.* at p. 1239.

The determination of whether particular conduct has brought the judicial office into disrepute, of necessity, is a determination which must be made on a case by case basis as the particular conduct in each case is scrutinized and weighed.

\*    \*    \*    \*    \*    \*

■ To sustain a charge under this Section, the Board must make a persuasive showing that (1) the judicial officer has engaged in conduct which *is so extreme* that (2) it has resulted in bringing the judicial office into disrepute. *Id.* at p. 1238 (emphasis in original).

*Cicchetti, supra,* at 312.

We find that Respondent's conduct in this case was so persistent, so pervasive, so inescapable, so diminishing of his office, and so extreme that we conclude that disrepute was brought upon the judicial office itself.

(d) *Failure to conduct himself at all times in a manner promoting public confidence in the integrity of the judiciary (Count 2).*

■ The Board alleges this is a violation of Rule 2A. of the Rules Governing Standards of Conduct of District Justices. That Rule provides:

A. A district justice shall respect and comply with the law and shall conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. A district justice shall not allow his family, social or other relationships to influence his judicial conduct or judgment. He shall not lend the prestige of his office to advance the private interest of others, nor shall he convey or permit others to convey the impression that they are in a special position to influence him.

On more than a few occasions this Court has been required to review various types of conduct to determine whether violations of Rule 2A. of the Rules Governing Standards of Conduct of District Justices or Canon 2 of the Code of Judicial Conduct had occurred.[19] On more than a few occasions we have held what conduct does and what conduct does not, fall within the compass of Rule 2A. and Canon 2. These holdings clearly inform that the conduct in this case belongs in the latter category.

For example, in *Cicchetti* we said:

Canon 2 ... [is] directed at conduct which would impugn or detract from the ... "integrity and impartiality ... of the judiciary." "Integrity" must be read *in pari materia* with ... "impartiality" in Canon 2. Both of these words and both of these Canons [referring also to Canon 1] exhort judges to carefully preserve all appearance of even-handedness, of not favoring or appearing to favor either side in a case, of being and appearing free from influence.

*Cicchetti, supra,* at 313.

In *In re Smith, supra,* at 1240 we held that:

Canon 2 in general is directed towards conduct which could potentially cause the public or litigants to believe that a judge is not acting impartially.

Curiously, in drafting its charged violation of Rule 2A., the Board has omitted the word "impartiality" which, as stated in *Cicchetti*[20] and elsewhere[21] contains the core

---

**19.** The language of the Canon and the Rule are essentially identical.

**20.** *Cicchetti* was affirmed by the Pennsylvania Supreme Court. In the course of its opinion that Court stated: "Canon 2 ... addresses the judicial decision-making process and seeks to avoid the appearance of influence over judi-

intendment of the Rule.[22]

Consequently, we hold that Respondent's conduct does not constitute a violation of Rule 2A. of the Rules Governing Standards of Conduct of District Justices.

(e) *Failure to be patient, dignified and courteous to members of his staff subject to his direction and control (Count 3).*

■ The Board avers that Respondent's conduct described in PART A of the Complaint constitutes a violation of Rule 4C. The full text of Rule 4C. provides:

C. A district justice shall be patient, dignified and courteous to litigants, witnesses, lawyers and others with whom he deals in his official capacity, and shall require similar conduct of lawyers, of his staff and others subject to his direction and control.

Anyone attempting to characterize Respondent's conduct described in this record[23] as "patient" or "dignified" or "courteous" at once discovers the impossibility of managing that. The fact is, in this judicial office, patience, dignity, and courtesy were verifiable casualties. We will not belabor the point. We find that the Board has met its burden of proof in establishing a violation of Rule 4C. of the Rules Governing Standards of Conduct of District Justices.

## 2. PART B.

(f) *Using the premises established for the disposition of his magisterial business for other gainful pursuit (Count 4).*

■ In Count 4 the Board charges that Respondent's use of his magisterial office and employees to prepare and mail "Quickie Notes" is a violation of Rule 3B. of the Rules Governing Standards of Conduct of District Justices.

Rule 3B. provides:

A district justice shall not use or permit the use of the premises established for the disposition of his magisterial business for any other occupation, business, profession or gainful pursuit.

The question, then, is whether the business of sending out the "Quickie Notes" falls within the meaning of the words "any other occupation, business, profession or gainful pursuit" in the context of Rule 3B.

We have found as a fact that the purpose for the "Quickie Notes" was to get Respondent votes—to curry favor with the electors in order to improve his prospects for re-election—in reality, an ongoing political campaign.

There is some suggestion in the record that, because the "Quickie Notes" did not contain any overt request that the recipient vote for Respondent,[24] the project had

---

cial activities." 560 Pa. 183, 201, 743 A.2d 431, 441 (2000).

21. *See, also, In re Smith, supra,* at 1229; *In re Toczydlowski,* 853 A.2d 20, 22–23 (Pa.Ct.Jud. Disc.2004); *In re McCutcheon,* 846 A.2d 801, 816–17 (Pa.Ct.Jud.Disc.2004); *In re Strock,* 727 A.2d 653, 658–59 (Pa.Ct.Jud.Disc.1998); *In re Walters,* 697 A.2d 320, 322 (Pa.Ct.Jud. Disc.1997).

22. The other language of Rule 2A. not included in the Board charge: "A district justice shall not allow his family, social or other relationships to influence his judicial conduct or judgment. He shall not lend the prestige of his office to advance the private interest of others, nor shall he convey or permit others to convey the impression that they are in a special position to influence him" provides further support for this interpretation of Rule 2A.

23. Some of which is admitted.

24. N.T. 85–86, 151–52, 229–30, 411–12.

nothing to do with an effort "to get votes." [25] What, then, was the purpose?

Respondent suggests that the "Quickie Notes" enterprise was designed simply to demonstrate to the recipients that this judicial officer was interested in the accomplishments—however small (or large)—of his neighbors and designed, at bottom, to cast an aura of benignity on the judicial office. [26]

In the face of what we regard as the perfectly obvious purpose of the "Quickie Notes," these suggestions of Respondent abuse credulity and serve only to diminish any inclination a fact finder might have to credit any of his testimony.

Having passed on that subject, we turn now to consider whether the "Quickie Notes" project is an undertaking which Respondent is prohibited to conduct in his magisterial office with his magisterial employees. We hold that it is.

We believe the language of the Rule compels that holding. The language is:

A district justice shall not use or permit the use of the premises established for the disposition of his magisterial business for any other occupation, business, profession or gainful pursuit.

We are persuaded that the clear intention of the Supreme Court in promulgating this Rule was to ensure that "the premises established for the disposition of his magisterial business" was limited to the disposition of his magisterial business. We are certain that the Supreme Court did not intend to approve the conduct of political campaigns out of magisterial offices with court-appointed employees.

Respondent suggests that the absence of any overt solicitation of votes or monetary contributions negates the inclusion of the ongoing "Quickie Notes" project as a "gainful pursuit"; and the use of the conjunction "or" in conjunction with "gainful" requires that the modification thus attached to "pursuit" be equally applied to modify "occupation, business [and] profession." We are not averse to that approach to interpretation of this Rule; however, we have held that the obvious purpose of the "Quickie Notes" was to get votes and that Respondent was conducting an ongoing political campaign out of his magisterial office. We have no difficulty in qualifying an enterprise designed for the pursuit of the office of district justice with its attendant salary and perquisites as a "gainful pursuit," and, therefore, conclude that this activity constitutes a violation of Rule 3B. of the Rules Governing Standards of Conduct of District Justices.

■ Finally, we would be remiss if we did not point out that Respondent's "Quickie Notes" program is a violation of the Order of June 29, 1987 of the Pennsylvania Supreme Court promulgating its Guidelines Regarding Political Activities of Court-Appointed Employees. [27]

That Order provides:

*Guidelines Regarding Political Activity by Court-Appointed Employees*

1. *Definitions.*

(a) The term "partisan-political activity" shall include but is not limited to, running for public office, serving as a party committee-person, working at a polling place on Election Day, performing volunteer work in a political campaign, soliciting contributions for political campaigns, and soliciting contributions for a political action com-

---

**25.** Moot and Weaver both testified that Respondent told them that *was* the reason, N.T. 36, 101.

**26.** N.T. 411.

**27.** 82 Administrative Docket No. 1.

mittee or organization, but shall not include involvement in non-partisan or public community organizations or professional groups.

(b) The term "court-appointed employees" shall include, but is not limited to, all employees appointed to and who are employed in the court system, statewide and at the county level, employees of the Administrative Office of Pennsylvania Courts, Court Administrators and their employees and assistants, court clerks, secretaries, data processors, probation officers, and such other persons serving the judiciary.

2. *Prohibition on Partisan Political Activity.*

Court-appointed employees shall not be involved in any form of partisan political activity.

3. *Termination of Employment.*

Henceforth, a court-appointed employee engaging in partisan political activity shall cease such partisan political activity at once or shall be terminated from his or her position. In the event an employee chooses to become a candidate for any office, such employee shall be terminated, effective the close of business on the first day of circulating petitions for said office.

4. *President Judge.*

The President Judge of each appellate court or county court of common pleas shall be responsible for the implementation of these guidelines and shall be subject to the review of the Judicial Inquiry and Review Board for failure to enforce.

Since it is clear that Moot, Weaver and Roberts were "court-appointed employees,"[28] and since it is clear that the "Quickie Notes" program amounted to "partisan political activity,"[29] it is clear that the program violates the *"Prohibition on Partisan Political Activity"* spelled out in paragraph 2 of the Guidelines as follows:

Court-appointed employees shall not be involved in any form of partisan political activity.[30]

The Order of the Supreme Court and the Guidelines promulgated thereunder, is a "rule prescribed by the Supreme Court" under Article V, Section 18(d)(1) of the Pennsylvania Constitution. That Section provides:

A justice, judge, or justice of the peace may be suspended, removed from office other otherwise disciplined … for conduct in violation of a canon or rule prescribed by the Supreme Court.

It is, of course, true that Respondent has not been charged with a violation of this rule. Any suggestion, however, that

**28.** "Court-appointed employees" are defined to include "all employees appointed to and who are employed in the court system, statewide and at the county level … court clerks, secretaries … and such other persons serving the judiciary." Guidelines, *supra*, para. 1(b).

**29.** "Partisan political activity" is defined to include "running for public office." Guidelines, *supra*, para. 1(a).

**30.** Use of court-appointed employees to assist in a judge's retention election campaign was an issue before this Court in *In re Cicchetti,*

697 A.2d 297, 314–15 (Pa.Ct.Jud.Disc.1997). There we held that work in a retention election was not "partisan political activity" and consequently, not a violation of the Supreme Court's Order. The Supreme Court affirmed that holding but stated in its opinion that court-appointed employees may no longer participate in judicial retention election campaigns, 560 Pa. 183, 201–04, 743 A.2d 431, 441–42 (2000). Of course, district justices do not run for retention so their election campaigns always involve partisan political activity.

this may derogate Respondent's right to due process does not hold for, as the Supreme Court held in *In the Matter of Glancey*, 518 Pa. 276, 542 A.2d 1350 (1988) and in *In the Matter of Cunningham*, 517 Pa. 417, 538 A.2d 473 (1988), and as we held recently in *In re Harrington*, No. 6 J.D. 04, 877 A.2d 570 (Pa.Ct.Jud.Disc. 2005), the Board's focus on one rule and this Court's finding violation of another is not prejudicial because the underlying conduct is the same and the Respondent has been advised of what that was from the beginning of these proceedings.

Thus we hold Respondent's use of his magisterial district office employees in the implementation of his "Quickie Notes" program was a violation of the Supreme Court Order of June 29, 1987 and a concomitant violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

## V. CONCLUSIONS OF LAW

### PART A.

■ 1. The conduct of Respondent does not constitute misconduct in office.

2. The conduct of the Respondent is not such that prejudices the proper administration of justice.

3. The conduct of Respondent is such that brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

4. The conduct of Respondent does not constitute a violation of Rule 2A. of the Rules Governing Standards of Conduct of District Justices.

5. The conduct of Respondent does constitute a violation of Rule 4C. of the Rules Governing Standards of Conduct of District Justices.

### PART B.

6. The conduct of Respondent in instituting and carrying on the preparation and mailing of "Quickie Notes" to constituents constituted an ongoing political campaign.

7. The use of his magisterial district office and his magisterial district office employees for the preparation and mailing of "Quickie Notes" constituted a "gainful pursuit" and was a violation of Rule 3B. of the Rules Governing Standards of Conduct of District Justices.

8. The Order of the Supreme Court of Pennsylvania dated June 29, 1987, 82 Administrative Docket 1, and the Guidelines promulgated thereunder, is a "rule prescribed by the Supreme Court" under Article V, § 18(d)(1) of the Pennsylvania Constitution.

9. During the time they worked in Respondent's magisterial district office, Karen Roberts, Diane Weaver and Daphne Moot were "court-appointed employees" under the Supreme Court Guidelines when they assisted Respondent in his campaign efforts by preparing and mailing "Quickie Notes" to his constituents.

10. The said activity constituted "partisan political activity" under the Supreme Court Guidelines encompassed in the Supreme Court Order.

11. The said activity was a violation of a "rule prescribed by the Supreme Court" and a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

12. Respondent is subject to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution.

SPRAGUE, J., did not participate in the consideration or disposition of this case.

## ORDER

PER CURIAM.

AND NOW, this 14th day of April, 2005, based upon the Opinion filed herewith, it is hereby ORDERED:

That, pursuant to C.J.D.R.P. No. 503, the attached Opinion with Findings of Fact and Conclusions of Law be and it is hereby filed, and shall be served on the Judicial Conduct Board and upon the Respondent,

That, either party may file written objections to the Court's Findings of Fact and Conclusions of Law within ten (10) days of this Order. Said objections shall include the basis therefor and shall be served on the opposing party,

That, in the event that such objections are filed, the Court shall determine whether to entertain oral argument upon the objections, and issue an Order setting a date for such oral argument,

That, in the event objections are not filed, within the time set forth above, the Findings of Fact and Conclusions of Law shall become final, and this Court will conduct a hearing on the issue of sanctions on May 18, 2005 at 1:00 p.m. in Commonwealth Court, Courtroom No. 1, 5th Floor, Irvis Office Building, Harrisburg, Pennsylvania, and

That, the Judicial Conduct Board and the Respondent shall each file on or before May 13, 2005 a list of such witnesses as either party may intend to present for testimony at that hearing, and shall serve a copy of said list upon the other party.